ST. LOUIS, IRON MOUNTAIN & SOUTHERN RAILWAY CO.
v. RAMSEY.

Decided May 24, 1890.

1. *Navigable streams—Definition.*

    Actual navigability is in law the test of a navigable stream.

2. *Riparian owner—Navigable stream.*

    A riparian owner upon a navigable stream, deriving title from the United States, takes only to high-water mark, and not to the middle of the stream, the title to the bed of the stream being in the State.

3. *High-water mark—Definition.*

    The high-water mark of a navigable stream, the line delimiting its bed from its banks, is to be found by ascertaining where the presence and action of water are so usual and long continued in ordinary years as to mark upon the soil of the bed a character distinct from that of the banks in respect to vegetation and the nature of the soil.

4. *Accretion—Alluvion.*

    Accretion is the increase of real estate by the addition of portions of soil by gradual deposition through the operation of natural causes to that already in possession of the owner. Alluvion is a term applied to the deposit itself, while accretion denotes the act.

5. *Gravel bar—Bed of river.*

    A gravel bar in the bed of a navigable river, over which steamboats in ordinary high water pass, which is distinguishable from the bank by the absence of soil and vegetation, is not alluvion added to the land of the riparian owner, but belongs to the State.

APPEAL from *Independence* Circuit Court.

J. W. BUTLER, Judge.

*Dodge & Johnson* for appellant.

By the common law, if a stream was not navigable, the riparian owners took "*usque ad medium filum aquæ.*" If navigable, his title stopped at the bank at high-water mark; low-water mark was never recognized as a boundary. In navigable waters, the State owns the bank and beds of

streams. Woolrych on Waters, 40–44; Angell on Tide Waters, 22–24; 9 Conn., 40; 3 Iowa, 54; 6 N. Y., 522; 33 N. Y., 461; 94 U. S., 325; 3 Howard, 27, 220.

The difficulty in applying the common law rule arises from the impossibility of reconciling the English common law definition of a navigable stream with the conditions and surroundings here. At common law, in England, no stream was deemed navigable above the point where it was affected by the ebb and flow of the tide. Some of our States have adopted this rule, but many others declare the true definition to be a stream which is actually navigable. Houck on Rivers, sec. 45, p. 26 *et seq.; Genesee Chief*, 12 How., 454. See Gould on Waters, sec. 76, citing 7 Wall., 222, and 94 U. S., 324.

The question is an open one in this State, and is not concluded by 25 Ark., 120. The only question decided there was, that an accretion by alluvion, where the land was left dry by dereliction or recession of water of an *unnavigable lake*, belonged to the adjacent owner of the soil.

The true rule is laid down to be: that, in rivers navigable in fact, the riparian proprietor owns only to high-water mark. 7 Wall, 287; 94 U. S., 324; 16 Pet., 367; 3 How., 212; 9 How., 471; 3 Iowa, 1. These authorities further hold that: (1) The rule that a grant is to be construed most strictly against the grantor does not apply to public grants; (2) the government being a trustee for the public, its grants are to be construed strictly; (3) grants by the United States by patent have relation to the survey, plats and field notes; (4) the common law knows but two lines, *medium filum aquæ*, and high water. If navigable, the boundary is the latter; if not navigable, the former. See also 4 Iowa, 212; 26 Kan., 682; 124 U. S., 656; 6 N. Y., 522; 93 N. Y., 144; 103 N. Y., 260; 33 N. Y., 499; 2 Binn. (Pa.), 475; Walker, Chy., 168; 2 McLean, 376; 54 Wis., 684; 34 N. W. Rep., 288; 33 N. W. Rep., 367; 12 N. E. Rep., 244; 32 Fed. Rep., 19.

*H. S. Coleman* for appellees.

The bar in question is an accretion, and belongs to the riparian owner.    25 Ark., 120; 10 Pet., 662; 7 Wall., 272. The boundary is never high-water mark, but either low water or *medium filum aquæ.*    2 Ohio, 309; 5 Wheat, 386; 11 Ohio, 311; 23 Wall., 46; Sec. 1940, Mansf. Dig.

Low water or the main channel has a fixed and well defined existence. "Ordinary high water" is uncertain and variable.

A gravel bar is alluvium. See Webster's Dict. It is an accretion, and belongs to the land owner whether the stream is navigable or not.    25 Ark., 120.

*J. C. Yancey* also for appellees.    •

Appellees own to low-water mark or the thread of the stream.    1 S. E. Rep., 731; Gould on Waters, sec. 65. When an accretion is formed, there is no distinction between navigable and non-navigable streams.    25 Ark., 120.

A grant from the United States to land upon the Mississippi river extends to the thread of the current. 82 Ill., 179. The riparian owner has the exclusive right to low-water mark, subject to the easement for commerce.    47 Ill., 384; 49 Ill., 172; 3 Washb. R. P. (5th ed.), 60 to 66 and notes; *Chicago v. McGinn,* 51 Ill., 266; *Canal Trustees v. Havens,* 11 Ill., 554; *Hunter v. Middletona,* 13 Ill., 50; *Gavitt v. Chambers,* 3 Ohio, 496; *Banner v. Platt,* 6 Ohio, 504; *Lamb v. Ricketts,* 11 Ohio, 311; *Walker v. Board of Public Works,* 16 Ohio, 540; *Hickok v. Hine,* 23 Ohio St., 523; *Nihaus v. Shepperd,* 26 Ohio St., 40; *Sloan v. Biemiller,* 34 Ohio St., 492 and 512; *June v. Purcell,* 36 Ohio St., 396; Gould on Waters, secs. 45 and 46; Kent's Commentaries (13th ed.), vol. 3, secs. 427 and 428.

"A deed conveying land, formerly fronting on a river, by its section numbers passes title to land added thereto by accretion." *Tappedorf v. Downing,* 18 Pac. Rep. (Cal.), 224;

*Heirs of Leonard v. City of Baton Rouge*, 4 So. Rep. (La.), 241; *Wiggenhorn v. Kounts*, 37 N. W. Rep. (Neb.), 603; *Rute v. Seeger*, 35 Fed. Rep., 188; *Boynton v. Miller*, 42 Iowa, 579; *Musser v. Hersley*, 42 Iowa, 356; *Morrow v. Benson*, 61 Mo., 345; *Delaphine v. Railway*, 42 Wis., 214.

Land formed by accretion belongs to the riparian owner. Anderson, Law Dict., p. 52; 84 Mo., 372; 86 Mo., 209; 6 S. W. Rep., 344; Gould on Waters, secs. 85, 155, 156, 159; 2 Blk. Com., 263; 3 Kent, Com., 428; 2 Wash., Real Prop., 58, 452.

HUGHES, J.   Appellees, being the owners as tenants in common by inheritance from an ancestor, who derived title under a patent from the United States government, of the northwest fractional part of section 21, township 13 north, range 6 west, on the bank of and bordering on White river, in Independence county, containing according to the patent, 22.59 acres, the patent for which bears date 12th of December, 1823, brought suit against the railway company to recover the value of 3,658 car loads of gravel, which the appellant took from a gravel bar, which, the appellees alleged in their complaint, was lying immediately adjacent to and between the high bank and the water in the main channel of White river.   They alleged that this bar had formed against the bank by long years of accretion, and that it is not now part of the main or ordinary channel of the river, but that it has become a part of their said tract of land by accretion, and lies immediately in front of the same between the banks of said stream.

The appellant answered, admitting the location, as described, of the tract of land, and the taking of the gravel from the bar, but denied that the gravel bar was a part of the tract of land owned by the plaintiffs.

The proof showed that the gravel bar was not a part of

the northwest fractional quarter of section 21, township 13 north, range 6 west, but that it laid "in the river bed, in front of the tract of land;" that twenty-five years ago, the bed of White river ran where the gravel bar now is; that before that time the river ran along the edge of the bank; that the gravel bar had formed slowly for years; that it is not above the ordinary stage of high water, and is bare at low water, and that a rise in the river from six to eight feet would cover it; that from ten to fifteen feet is an ordinary high water rise, and would leave the gravel bar from five to eight feet under water; that no trees or soil grew on the bar; that the position is this—first, there is a high bank, then a second bottom, then a gravel bar, and then the water; that the second bottom is five or six feet higher than the bar; that any year, at some time, the water in the river rises from fifteen to twenty-two feet; that in ordinary high water steamboats can pass right on the gravel bar in controversy; that there is a swag between the gravel bar and the bank, in which minnows have often been caught; that the water often rises over this gravel bar in one night.

The cause was submitted to a jury upon the evidence and instructions of the court, and there was a verdict for appellees, which, upon motion by appellant for a new trial, the court refused to disturb, whereupon appellant, having saved exceptions to the giving and refusing of instructions by the court, appealed.

The main question to be determined is, how far the ownership of the appellees in the land between the banks of the river, in front of their tract, extends, by virtue of their ownership of the land upon the bank of the river, under the patent from the government of the United States.

1. What is a navigable stream.

At common law, "as a general principle, the soil of ancient navigable rivers, where there is a flux and reflux of the sea, belongs to the crown, and that of other streams to the subject, that is, to the owners of the adjacent grounds,

to each respectively, as far as the middle of the stream."
Woolrych on Waters, 44.    The ebb and flow of the tide in a
river was at common law the most usual test of its navigability,
but was not a conclusive test.    Woolrych on Waters, 40.

The soil under navigable streams, at common law, be-
longed to the king as *parens patriæ*, for the same reason that
the waters did; that is, as a trust for the public use and
benefit.    Woolrych on Waters, chs. 1 and 2;  Angel on Tide
Waters, 19–67;  Hale, De Jure Maris, cited in 6 Cowen,
539;  *Chapman v. Kimball*, 9 Conn., 38.

Many States of the United States have held to the com-
mon law test of the navigability of rivers, and to the doctrine
that only those rivers are navigable in a legal sense in which
the tide ebbs and flows, and there has been much discussion
and conflict of authority upon this question, a majority in
number, perhaps, of the courts of last resort maintaining the
common law doctrine.    But the more reasonable test, as we
conceive, of the navigability of a river is its use as a navigable
stream, or its capability of being used as such.    The ebb and
flow of the tide is merely an arbitrary test, since many waters
where the tide flows are not in fact navigable, and many, es-
pecially on this continent where it does not flow, are nav-
igable.    "It is navigability in fact that forms the foundation
for navigability in law."    *McManus v. Carmichael*, 3 Iowa,
1;  *Genesee Chief*, 12 Howard, 443.

While in England the ebb and flow of the tide is the most
convenient, certain and usual test of the navigability of rivers,
as the tide in fact does ebb and flow in all the navigable rivers,
it is wholly inapplicable in this country, where there are large
fresh water rivers thousands of miles long, flowing almost
across the entire continent, bearing upon their bosom the
commerce of the outside world in part, as well as of the con-
tinent.    The longest river in England, the Thames, is only
about 250 miles, and the Severn is only about 210 miles in
length.

**2. Riparian owner—Navigable stream.** If we apply the principle of the common law, that the soils under the navigable waters belong to the sovereign for the benefit and use of the public, and are not governed by the common law test of the navigability of streams, but by their navigability in fact, we are constrained to maintain that the true doctrine is that the beds of navigable rivers belong to the State, notwithstanding the tide does not ebb and flow in them. In *Pollard's Lessee v. Hagan*, 3 How., 213, it is held, that ''The shores of navigable waters, and the soils under them, were not granted by the Constitution to the United States, but were reserved to the States respectively; and the new States have the same rights, sovereignty and jurisdiction over this subject as the original States.'' And Mr. Justice McKinley, delivering the opinion of the court, at page 229 says: ''Then to Alabama belong the navigable waters, and soils under them, in controversy in this case, subject to the rights surrendered by the Constitution to the United States.'' And on page 230 he says: ''To give to the United States the right to transfer to a citizen the title to the shores and the soils under the navigable waters, would be placing in their hands a weapon which might be wielded greatly to the injury of State sovereignty, and deprive the State of the power to exercise a numerous and important class of police powers.'' *Goodtitle v. Kibbe*, 9 How., 471, affirms the doctrine of this case, and holds that the title to the soil in navigable waters below high-water mark is in the State.

In the case of *McManus v. Carmichael, supra*, the court held that, by the acts of the United States relating to the survey and sale of public lands (see act of May 18, 1796, etc.), and also by the law establishing the general land office, the whole bed of navigable rivers is excepted from the surveys, and that the lands of the United States are sold with reference to the plats and field notes of the survey. It is also held in the same case that the rule that grants are to be construed most strongly against the grantor does not apply to public grants;

but that, the government being but a trustee for the public, its grants are to be construed strictly. This is familiar law. In *Middleton v. Pritchard*, 3 Scam., 510, Mr. Justice Wilson in a dissenting opinion says in regard to the sale of lands by the government: "The land authorized to be sold, and the mode of selling it, is prescribed by law, and all sales in violation of that are void. * * * These surveys and plats are the guides of the land officers in making their sales. They have no authority to sell a single acre that has not been surveyed."

In *Barney v. Keokuk*, 94 U. S., 324, Mr. Justice Bradley, in discussing this question, says on page 336: "In this country, as a general thing, all waters are deemed navigable, which are really so;" and on page 338 he says: "In our view of the subject the correct principles were laid down in *Martin v. Waddell*, 16 Pet., 367, *Pollard's Lessee v. Hagan*, 3 How., 212, and *Goodtitle v. Kibbe*, 9 Id., 471. These cases related to tide-water, it is true; but they enunciate principles which are equally applicable to all navigable waters. And since this court, in the case of *The Genesee Chief*, 12 Id., 443, has declared that the Great Lakes and other navigable waters of the country, above as well as below the flow of the tide, are, in the strictest sense, entitled to the denomination of navigable waters, and amenable to the admiralty jurisdiction, there seems to be no sound reason for adhering to the old rule as to the proprietorship of the beds and shores of such waters. It properly belongs to the States by their inherent sovereignty, and the United States has wisely abstained from extending (if it could extend) its surveys and grants beyond the limits of high water. The cases in which this court has seemed to hold a contrary view depended, as most cases must depend, on the local laws of the States in which the lands were situated."

But it is necessary to a full understanding of the rights of a riparian owner and of the public in the lands between the banks of a river to determine the legal meaning of the phrase, 3. "High-water mark" defined.

"high water." It does not mean, as has been sometimes supposed, the line reached by the great annual rises, regardless of the character of the lands subject at such times to be overflowed. But, as decided in the case of *Houghton v. Railway*, 47 Iowa, 370, "high water mark then, as the line between the riparian proprietor and the public, is to be regarded as coordinate with the limit of the river bed. Whatever difficulty there may be in determining it in places, this doubtless may be said: What the river does not occupy long enough to wrest from vegetation, so far as to destroy its value for agriculture, is not river bed."

In *Howard v. Ingersoll*, 13 How. (U. S.), 381, Mr. Justice Curtis gave a satisfactory definition of the bank and bed of a river. He says, "The banks of a river are those elevations of land which confine the waters when they rise out of the bed; and the bed is that soil so usually covered by water as to be distinguishable from the bank by the character of the soil, or vegetation, or both, produced by the common presence and action of flowing water. But neither the line of ordinary high-water mark, nor of ordinary low-water mark, nor of a middle stage of water, can be assumed as the line dividing the bed from the banks. This line is to be found by examining the bed and banks, and ascertaining where the presence and action of water are so common and usual, and so long continued in all ordinary years, as to mark upon the soil of the bed a character distinct from that of the banks, in respect to vegetation, as well as in respect to the nature of the soil itself. Whether this line between the bed and the banks will be found above or below, or at a middle stage of water, must depend upon the character of the stream. * * * But in all cases the bed of a river is a natural object, and is to be sought for, not merely by the application of any abstract rules, but as other natural objects are sought for and found, by the distinctive appearances they present; the banks being fast land, on which vegetation, appropriate to such land in

the particular locality, grows wherever the bank is not too steep to permit such growth, and the bed being soil of a different character and having no vegetation, or only such as exists when commonly submerged by water."

The owner of land on the margin of a navigable stream in this State, holding under a grant from the United States government, does not take *ad medium filum aquæ*, but to high-water mark, as limited and defined above, and the beds of all navigable rivers in the State belong to the State in trust for the use of the public.

Was the gravel bar an accretion to appellee's land?

Accretion to a land on a stream navigable or unnavigable belongs to the owner of the land; therefore, if appellee's contention that this bar has become a part of his land by accretion has been maintained, the judgment of the circuit court is correct. *Warren v. Chambers*, 25 Ark., 120; *New Orleans v. U. S.*, 10 Peters, 662; 24 How., 41; 4 Wall., 502; A. & E. Encyclopœdia of Law, vol. 1, sec. 5, p. 137, and cases cited. Accretion is the increase of real estate, by the addition of portions of soil by gradual deposition, through the operation of natural causes, to that already in the possession of the owner. The term "alluvion" is applied to the deposit itself, while accretion rather denotes the act. 3 Wash. on Real Prop., 60 and 61; Bouvier's Law Dict., title, "Accretion;" Woolrych on Waters (lateral p. 29).

4. Accretion—Alluvion.

Fleta says: "We acquire a right to things, according to the law of nations, by accession. That which a stream has added to our land by alluvion for instance, belongs to us by virtue of the same law." Fleta, Liber 3, c. 2, sec. 6.

Does the testimony in this case show that the gravel bar is alluvion added to the land of the appellees by accretion? We think not. On the contrary, the evidence shows that the gravel bar is a part of the bed of White River, within the above definition.

5. Gravel bar—Bed of river.

Reversed and remanded.

# CASES DETERMINED

IN THE

# SUPREME COURT

OF THE

# STATE OF ARKANSAS,

AT THE

## MAY TERM, 1890.