WUNDERLICH ET AL. *v.* CATES ET AL.

4-8487                                   212 S. W. 2d 556

Opinion delivered June 21, 1948.

696

*Wils Davis* and *D. Fred Taylor, Jr.,* for appellant.

*Holland & Taylor,* for appellee.

GRIFFIN SMITH, Chief Justice. Ownership of an island in the Mississippi River is involved. The appeal presents (a) factual questions, (b) mixed questions of law and fact; and, (c) application of well established principles when it is ascertained which of the litigants presents a record showing a preponderance of competent and relevant testimony. Difficulty arises in determining what witnesses,—or, as here, which *group* of witnesses—had familiarity with physical condition, historical data, (including surveys, flood stages, uncontrolled action of waters, shore contours, elevations, and other factors, such as growth of vegetation and navigation)—all of which, it is urged, sheds light upon land

·formations created by shifting sands and rich alluvium in the area between Arkansas and Tennessee.

Appellants first insist that Harshman's Island is in Tennessee. This, if established, would deprive the Mississippi Chancery Court of jurisdiction, and the order restraining Alvin Wunderlich, Harry Stanford, Luther Gifford, and T. L. Brown from "going on or interfering with Harshman's Island or any accretions thereto" is void.

Responsive to a petition filed in February 1940 by W. C. Cates, the State Land Commissioner, under authority of Act 282 of 1917, caused a survey of Harshman's Island to be made. It disclosed a land area of 109.04 acres within Mississippi County, Arkansas. Field notes and other data incident to the survey were filed with the Commissioner and have been brought into the record as exhibits. The State's deed to Cates is dated April 1, 1940.

The complaint, filed in April 1942, asserted Cates' ownership of the island and his subsequent conveyance of a fourth interest to Andy Harshman, sale of an equal interest to Eddie Reginold, and a lease for 1940 to Jack Buchanan. When Buchanan's term expired January 1, 1941, he refused to quit. Suit in unlawful detainer was brought, with judgment for the plaintiff in June 1941. It was further alleged that on the day following judgment, Wunderlich, through collusion with Buchanan, "placed a Negro in possession of the island." Later the Sheriff established Cates and his co-plaintiffs in possession, removing the Negro. Cates began farming operations, but Wunderlich ". . . sent various and sundry persons to the island with teams and plows to cultivate. . . . These parties were arrested and fined in Municipal Court, . . ." etc. Another allegation was that Wunderlich caused one of plaintiff Cates' tenant houses to be broken into, the purpose being to hold possession through T. L. Brown's occupancy. Brown was arrested, put in jail, and released on bond. He returned to the island and again undertook to occupy the tenant property.

These and similar acts were relied upon by Cates to sustain the asserted jurisdiction of equity to abate conduct amounting to a nuisance and continuing trespasses. Want of an adequate remedy at law was urged.

As part of a comprehensive denial, Wunderlich, for himself and others, alleged invalidity of the State's deed to Cates. It was, he said, procured by false representations of the applicant, who induced the surveyor to act fraudulently. Affirmatively, Wunderlich alleged that the area in suit was part of Island 25, "being an island in the Mississippi River which formed more than 100 years ago some distance above its present position, and in the middle of 'the river."

It was then asserted that the main steamboat channel was on the Arkansas side of the river; that by gradual and imperceptible water processes the upstream end of Island 25 eroded, "and the foot built, until the said island assumed its present position in front of it, or on the river side of sections 12, 13, and 14, township 14 north, range 12 east, and section 18, township 14 north, range 13 east, as the sections were originally surveyed by the U. S. government as a part of Arkansas, about 1845. Subsequently the channel "caved away the Arkansas shore line as thus surveyed, but a few years later the channel left the Arkansas side of the river; and Island 25 gradually built downstream toward the Arkansas shore, until now a part of the island lies within the original boundaries of the Arkansas survey, but a greater portion lies eastwardly from said original river bank, and the present river channel is east and southeast of all of Island 25, including the island in controversy, the Mississippi River being the eastern and southeastern boundary of said island."

These allegations were followed by the assertion that for more than fifty years Island 25 had been generally regarded as part of Tennessee; that the true boundary between Arkansas and Tennessee at the point in question had not been established "by the proper forum, for the reason that Wunderlich, through mesne conveyances [shown by exhibits] acquired both the titles to all the

lands included within the Tennessee survey, and the said area, now being on the Tennessee side of the river; and all adverse claims of title being concluded and consolidated in Wunderlich, [he] has, for convenience, assessed said lands as a part of Arkansas, and has paid taxes thereon in Mississippi County for the past 25 years, and said tax payments have covered the area in question, as well as other parts of Island 25.''

Damages in the sum of $5,000 for wrongful issuance of the restraining order were prayed.

*First.*—Was the land in Arkansas? Appellant's admission that he assessed the property in Mississippi County ''for purposes of convenience'' is highly persuasive that Wunderlich thought it was in Arkansas. Leon W. Smith, special master appointed by the Chancellor, says it was undisputed that in 1892 Island 25 was generally considered a part of Arkansas. Children from the island went to Arkansas schools, electors of the island served on Arkansas juries and as school directors, and crimes committed on the island were tried in this State. Some of those residing on the island paid taxes in Tennessee in 1902, 1903, and 1904, but all refused after that time to recognize Tennessee sovereignty.

In 1904 Tennessee health officers went to the island to vaccinate against smallpox, but the citizens refused to concede their right to enforce the Tennessee law, and ''ordered the officers back.'' Irrespective of conflict in the evidence, it is our view that appellant did not overcome presumptions arising from the conduct of those immediately concerned, and the acquiescence by Tennessee over a long period of time in a seemingly undisputed status. This conduct justified the Land Commissioner's representative in believing that his survey was accurate, and that the conclusions to be drawn from all of the facts and circumstances supported one of two alternatives: (a) the land, geographically, was in Arkansas; or, (b) if substantial doubt existed, Tennessee had ostensibly yielded to the Arkansas view, and this was tantamount to disclaimer. *Maryland* v. *West Virginia*, 217 U. S. 1, 30 S. Ct. 268, 54 L. Ed. 645.

While we are not, in the case at bar, dealing with a controversy between two states, in respect of which the Constitution places original jurisdiction in the Supreme Court of the United States, certain principles mentioned by Mr. Justice DAY, who wrote the Court's opinion in the Maryland-West Virginia dispute, are applicable; for, said he, long acquiescence in the possession of territory, with the exercise of dominion and sovereignty over it, is conclusive of the nation's title and rightful authority. Citing *Indiana* v. *Kentucky,* 136 U. S. 479, 10 S. Ct. 1051, 34 L. Ed. 329. Again it was said, ''No human transactions are unaffected by time. Its influence is seen on all things subject to change. And this is peculiarly the case in regard to matters which rest in memory, and which consequently fade with the lapse of time and fall with the lives of individuals. For the security of rights, whether of states or individuals, long possession under a claim of title is protected.'' *Rhode Island* v. *Massachusetts,* 4 How. 591, 11 L. Ed. 1116.

The record with which we are dealing is void of any evidence showing that Tennessee in its sovereign capacity regards Harshman's Island as within its territorial area; hence, as between the litigants here, the Court was justified in assuming jurisdiction, and its decree will be binding upon the parties until in a contest between the two states there is a finding by the U. S. Supreme Court that the territory in question belongs to Tennessee. In that event the Arkansas decree might not be *res judicata.*

*Second.*—It is strenuously contended that, even if the island were judicially found to be in Arkansas, Chancery did not have jurisdiction of the subject matter; that appellants had the right to trial by jury, hence the decree is void. There are cases, such as *Smith* v. *Hamm,* 207 Ark. 507, 181 S. W. 2d 475, and *Howard* v. *Western Maryland Ry. Co.,* 138 Md. 46, 113 Atl. 574, holding (a) that although Chancery may enjoin criminal acts violative of personal and property rights, jurisdiction will not be assumed where the resulting decree is inferential only, and not determinative in respect of the plaintiff's property rights; and, (b) that injunction should not be

granted for the permanent enforcement of an alleged right if that right is involved in reasonable doubt.

In the Smith-Hamm case Mr. Justice KNOX quoted with approval from *Crighton* v. *Dahmer,* 70 Miss. 602, 13 So. 237, 21 L. R. A. 84, 35 Am. St. Rep. 670, where it was said that ordinarily equity will not interfere to prevent the commission of criminal acts if the injury resulting to property is consequential only; but if the acts (although criminal in the sense that penalties have been imposed for their commission) are primarily and essentially an injury to property, preventive relief may be granted within the same limits and under the same conditions as though the element of criminality were absent: that is, an injunction will not issue unless the threatened damage is irreparable and the evidence is clear and convincing.

Injunctive relief was upheld in *Ritholtz* v. *Arkansas State Board of Optometry,* 206 Ark. 671, 177 S. W. 2d 410, a statement in the opinion being that action of the Board in attempting to restrain the defendant from engaging in a practice denounced by Act 94 of 1941 was not a proceeding to restrain the commission of a crime, *as such.* Rather, the object was to stop the illegal practice of optometry, prevention of which could not be adequately dealt with by invidiual prosecution.

The same principle applies to Cates' right to make use of his property without molestation. 'The State's deed was, *prima facie,* evidence of ownership. Until appellants had shown a superior title they were trespassers whose conduct was repeatedly found to be of a criminal nature. When persisted in, in willful disregard of legal authority, the acts assumed a propensity disclosing malignant willfullness. In these circumstances property rights were impaired.

It is true there was no allegation of insolvency— a declaration ordinarily essential to a proceeding of this nature. There were certain elements, however, that were difficult of ascertainment in monetary measurement. The mere fact that a defendant is solvent does not of itself place his acts of aggravation beyond injunctive reach.

If appellants had acquiesced in judicial findings that they were without legal right to harass Cates, there would have been no final determination of property rights in this Chancery action.

While strenuously insisting that as record owner "and in actual and constructive possession" he was entitled to trial by jury, Wunderlich prayed for affirmative relief—including damages for $5,000; also that the State's deed be cancelled as a cloud upon his title. Had the proceeding by Cates been one in ejectment, not associated with a distinct equitable right, appellant's objection would be tenable.

Cates claims to have been in actual possession. His deed from the State was color of title, for its execution was in pursuance of a discretion vested by Act 282 of 1917 to determine essential facts. Since by express terms the Act is not applicable to lands formed by accretion, it necessarily follows that the Commissioner, in making the sale, must have found that Harshman's Island was not an accretion; hence, until fraud had been shown, the deed, *prima facie*, was good. *Reed* v. *Wilson*, 163 Ark. 520, 260 S. W. 438; nor could the State's right to have the island surveyed for the purpose of determining its status under Act 282 be lost by adverse possession. *Jones* v. *Euper*, 182 Ark. 969, 33 S. W. 2d 378. See *Lewis* v. *Owen*, 146 Ark. 469, 225 S. W. 648, where it was held that in the absence of fraud or collusion the Commissioner's decision that land the petitioner sought to buy was not an island could not be controlled by mandamus, even if erroneous. Judge John E. Martineau (U. S. District Judge) said that the Arkansas decisions were authority for the proposition that a determination by the Land Commissioner that lands deeded under Act 282 were island formations concluded the state from contending otherwise, in the absence of fraud or collusion. *State of Arkansas ex rel. Norwood, Attorney General,* v. *Rust Land & Lumber Co.,* 51 Fed. 2d 555.

*Third.*—If Wunderlich is to prevail his title must rest upon one of two contentions: (a) The so-called island was, in fact, an accretion to lands as to which he

has shown ownership, or (b) an area formerly owned by Wunderlich submerged, and from the bed of this once-destroyed land a new formation arose, constituting what is now called Harshman's Island.

A comprehensive discussion of riparian rights is to be found in the Court's majority opinion by Judge BATTLE in *Wallace* v. *Driver,* 61 Ark. 429, 33 S. W. 641, 31 L. R. A. 317, cited and to some extent explained in *Yutterman* v. *Grier,* 112 Ark. 366, 166 S. W. 749. Quoting from *St. Louis, Iron Mountain & Southern Railway Co.* v. *Ramsey,* 53 Ark. 314, 13 S. W. 931, 8 L. R. A. 559, 22 Am. St. Rep. 195, (an opinion written by Judge HUGHES) it was said that a riparian owner upon navigable stream whose title derives from the United States takes only to high water mark and not to the middle of the stream, the bed of the stream being in the State. "This high water mark," says the Ramsey opinion, "is to be found by ascertaining where the presence and action of water are so usual and long continued in ordinary years as to mark upon the soil of the bed a character distinct from that of the banks in respect to vegetation and the nature of the soil." In the Wallace-Driver opinion Judge BATTLE added: "According to the cases . . . the high water mark, as thus defined, being the boundary line of the riparian owner in this State, is the point at which the formation of all lands acquired [by such owner] by accretion must begin. A formation of alluvion beginning at any other point would belong to the State or other party. In that case the gradual and imperceptible addition, which is necessary to constitute an accretion, would be lacking."

In the Yutterman-Grier case Chief Justice McCULLOCH said that the Court, in *Wallace* v. *Driver,* was speaking in general terms, for "it is not literally correct to say that the rule of accretion does not apply if any part of the process [of formation] is perceptible."

Act 127, approved April 26, 1901, affected "all lands which [have] formed or may hereafter form, in the navigable waters of this State and within the original boundaries of a former owner of land upon such

stream." Title was vested in the former owner, "his heirs or assigns, or in whoever may have lawfully succeeded to the right of such former owner therein." A preamble recites that "Under existing laws if such land reforms as an island in a navigable stream, though within the original boundary of the former owner, it belongs *not* to him, but to the State."

Under this Act appellant must prevail if Harshman's Island formed within original boundaries of Wunderlich's land, and this is true irrespective of the claim that it was an accretion to Island 25. In substantiation of this contention it is argued that testimony given by Ed Tillman, O. W. Gauss, and Wunderlich, partially superimposed upon Mississippi River Commission charts showing the river's progress between 1883 and 1906, and deed from St. Francis Levee District to Wunderlich, brings the transaction within the rule announced in *Lightfoot* v. *Williamson et al.,* 282 Fed. 592, where Act 19 of 1893, as amended by Act 75 of the same year, was construed.

In that case Lightfoot sought to quiet title to Bullinton Island in the Mississippi River as against Williamson and others who had held possession, with cultivation of the 425 acres, for 40 or 50 years. Lightfoot claimed under a deed from the State, pursuant to Act 282 of 1917. Williamson and others associated with him in the suit claimed under two quitclaim deeds from St. Francis Levee District, and the District, in turn, claimed under Acts 19 and 75 of 1893. Lightfoot, who was favored by the Land Commissioner, contended in Federal Court that the Commissioner's determination of ownership—whether in the District or State at the time Lightfoot's deed was executed September 19, 1918—was conclusive. The Circuit Court of Appeals, in affirming Judge Trieber, found it was not necessary to decide whether the Commissioner's deed could be questioned, "for," says Judge CARLAND's opinion, "If the Levee District had title to the land at the date of [its] quitclaim deeds, that title passed to [Williamson and others], and the Commissioner of State Lands had no jurisdiction to adjudicate the title. Whether the Levee District had

title . . . depends upon . . . whether the land was within its boundaries.''

So, says appellant, if at the time St. Francis Levee District conveyed to Wunderlich's grantors the land was within the District, then the Commissioner's deed to Cates was ineffective.

The Lightfoot-Williamson case deals with *re-formed lands,* as distinguished from accretions.

*Fourth—The Evidence.*—J. A. Pigg, an abstracter called by appellants as a witness, testified that he had certain records. From a photostatic copy of a map of Island 25 prepared by the Mississippi River Commission, the lines of Secs. 17 and 20 were shown. The work was done in 1923 or 1924. The records in Mississippi County, Arkansas, disclosed that part of the land of Island 25 was claimed by Lauderdale County, Tennessee, and an inspection of records at Ripley, Tenn., showed the same claims. The lines of Secs. 17 and 18 were projected from a designated corner of Sec. 18.

Copies of deeds numbered from three to twenty-three were introduced. Exhibit No. 18 was a deed from W. P. Hall and S. A. Forsythe, conveying to Alden Land & Timber Co. lands not pertinent to this controversy, and all of Secs. 17, 18, and 19, township fourteen north, range thirteen east, and accretions thereto, ''. . . located on Island 25 in the Mississippi River.'' The deed was dated June 21, 1920. A deed of February 23, 1917, from St. Francis Levee Board to W. P. Hall purported to coyvey ''All that body of land lying east and south of the original government meander line and west of the Mississippi River.'' It appears that Forsythe, who joined in Hall's deed to the Alden Company, derived title through a Tennessee grant.

Appellant's abstract contains the statement that in a partition suit concluded in 1907, involving the lands of W. W. Ward, certain lands were set aside to the Ward heirs, claimed by them under the Tennessee grant, ''. . . as well as under the riparian title to the Arkansas lands.'' The witness then said: ''I know that all of the lands in Secs. 17, 18, and 20, which we have been

discussing, are on Island 25, a considerable portion having been in cultivation since 1924."

Conceding, on cross-examination, that "his books" only covered lands in the Osceola District of Mississippi County, Pigg added, "If there is an island east of Island 25 known as Harshman's Island, I could not testify about it. . . . According to this map, all of Sec. 17 is on Island 25. . . . There could not be any island east of Island 25 in Secs. 17 and 20, according to the map." As summarized by appellants, the Pigg exhibits disclosed title ". . . to all riparian lands bordering on the Mississippi River along the reaches involved, and to all the accretions thereto, as well as the deed from St. Francis Levee District."

Wunderlich testified that the "area involved" is a part of Island 25, purchased by him in 1915 or 1916. The conveyances, he said, cover all of Sec. 17 and the north half of the north half of Sec. 20, "and the lands claimed by [Cates] are within the boundary lines of my deeds."

Appellant had heard there was an island called Harshman's "somewhere in there," but he was certain the land in Sec. 17 is all connected with the Arkansas shore. Twenty years ago he walked entirely across Secs. 17 and 18 without finding any water. It was "made" land, but would be covered by high water. Until Wunderlich heard that Cates had procured a deed from the State he did not know there was a place called Harshman's Island. The name "Harshman" was first used when the Land Commissioner's representative made the survey in 1940. "Wrenn Island," said the witness, [elsewhere in the testimony referred to for purposes of identifying other points] "is down in Sec. 19, township fourteen, range thirteen—possibly some in Sec. 20."

O. W. Gauss, civil engineer who was in the government service for fourteen years, testified that he had known Island 25 since 1910. He mentioned matters in substantiation of his belief that some of Island 25 was the Forsythe (Ward estate) lands included in the Tennessee grant. Since this phase of the litigation has been

decided against appellant, the contentions will not be reviewed.

Referring to a map introduced as an exhibit to Pigg's testimony, Gauss said that the lines of Secs. 17 and 20 were correctly drawn, and that these sections were a part of Island 25, and that Wunderlich had been in possession for twenty-five years. The particular area in controversy, identified by Cates as Harshman's Island, ". . . lies mostly in Sec. 17 [within the boundaries of deeds held by Wunderlich], and recorded." Referring to a map, surveys, and reports to be found in the Congressional Library at Washington, (copies of which were used) Gauss read from the 1824 edition of Cramer & Spears' "Navigator." Island 25 was spoken of as being "two miles below the bar, in the middle of the river, with a good channel on either side, and about a mile long."

Andy Harshman testified that the island bearing his name formed about 1918, and that vegetation appeared two years later. A sand bar connects it with the mainland, but water still separates the land in suit from Wunderlich's holdings. When asked how long after the bar appeared river traffic continued on each side of the island during low water stages, Harshman replied:

"I don't think any big boats [ran] during low water after 1927 or '28. Six or seven years after the growth [of vegetation] appeared the big boats quit running. [The channel] shut off at the upper end. I imagine it would take a big boat around 25 feet at Memphis to go through there." [Presumptively the witness intended to say that if the stage at Memphis were 25 feet, a big boat could negotiate the channel]. Again referring to the sand bar, Harshman said that it connected the land in litigation with the Wunderlich lands on Island 25. Later he testified that "There has always been, and still is, water between Mr. Wunderlich's land and Harshman Island."

There is a great deal of testimony to the same effect, and many statements that the property contended for by

Cates and his associates was never part of the Wunder-
lich holdings.

M. A. Meroney took a number of pictures in February
1942. For the purpose of photographing the essential
points the witness placed his camera in location just
south of the line between Secs. 17 and 20 "from Island
25 looking across to Harshman's Island." The photo-
graphs showed water between the mainland and Harsh-
man, "between 500 and 800 feet wide." The witness
then said: "After taking the pictures I walked around
enough to see the channel went into the river. Lex
Shamlin and I estimated, with a pole, that the bank was
fifteen feet high."

C. S. Baggett took pictures in 1941, using Island 25
as a base. He said: "The day [the pictures were taken]
we went down where the chute empties into the river. It
looked like it was four or five hundred feet wide."

J. C. Bright was familiar with Harshman's Island:—
"It appeared out in the middle of the river. Early in
1920 I worked for Luxora Cooperage Company, rafting
logs, going on both sides of the island with rafts. There
was a well defined channel between [Harshman's] and
the Arkansas shore. The formation first occurred as a
sand bar. . . . The first place it attached was at the
upper end, some time in 1918. I lived right at the head
of the chute in 1912 and 1913. I moved away permanently
in 1932, [but had lived in the same neighborhood all
those years"].

Henry Freeman said that the island began to "show
up" in 1918. At that time there was a channel between
the formation and Island 25, but it has filled since. Now
there is only a sand bar between the two islands, but
"water is running through there."

Corbia Dingler occupied Harshman's Island in 1941
as a tenant. We went to and from it in a boat. A sand
bar was spoken of as being "considerably north of the
land, connecting with Island 25 during the latter part
of the year, [but] there is water at all times [separating]
Mr. Wunderlich's line across [to Harshman's"]. On

cross-examination Dingler insisted that "water went through there until the fall of 1928. It was 25 or 30 yards wide, and 100 yards in the middle."

Ross Stevens, postmaster at Blytheville, had frequently hunted over the area in question. He had known Harshman's Island since 1925. It was separated from the mainland by a chute, but there were sandbar crossings.

Russell Farr identified a plat made by W. H. Lawhorn and O. W. Gauss in 1935 showing lands the witness owned. He said: "After the blueprint was made Mr. Wunderlich and I agreed on a boundary line 900 feet south of the line of Secs. 18 and 19, and we exchanged deeds. The picture [you have shown me] was taken with the camera near the dividing line [to which I have referred]. We took another picture down the chute two or three hundred feet, and we went down the chute to the river. . . . There is a well-defined chute between Wrenn's Island and Harshman's Island. . . . Several years ago I was on what is known as Harshman's Island when it was just a small body of sand and land out in the river. I walked from the lower end of Wrenn's Island on a sand bar without crossing any water at all."

On recall, Andy Harshman testified that water would run through the chute between Harshman's Island and the Arkansas shore when a stage of 21 feet at Memphis is reached. It would require a stage of 38 feet to put water over the island. . . . The water in the chute extends north [of Bench Mark A-1-32]. Before the 1937 [flood] it extended to the river. Now it is partly dry in low water periods, there being deep and shallow places in it. It goes dry in extremely low water."

J. W. Meyer, an engineer, identified Bench Mark A-1-32 on the enlargement of a map filed as an exhibit to Pigg's testimony. The contour showed a gradual lowering of the land "each way." It sloped off on all sides from the highest elevation of 250 feet, to the lowest point where the elevation was 225 feet.

C. M. Buck, Blytheville attorney of fine attainments, and one who has had many years of experience with liti-

gation resulting from accretion, avulsion, and island formations, made a personal inspection of the area involved, and said, "In my opinion Harshman's Island is an *island* if you mean to distinguish it from an accretion."

L. McMakin, 71 years of age—a steamboat pilot since 1900, had been familiar with the Mississippi River in the vicinity of Island 25 since 1916. He distinctly remembered that in 1932 or 1933 he made a trip upstream, ". . . going to the left of a towhead called Island 25 Towhead. The boat drew five or five and a half feet of water. Willows were sticking out on this towhead. I think it formed in 1916. . . . When I went between what I call Towhead of Island 25 and Island 25 the river was bank-full."

Rebuttal testimony offered by appellants was in direct contradiction to that offered on behalf of appellees.

Testifying for appellant Wunderlich, Ed Tillman (who claimed to have observed river trends for many years) said the Harshman Island area began forming as a gravel bar just below a point known as Tomato, then built south; "for," said he, "a bar forms at the shore and builds out." On cross-examination the witness testified there was a growth of willows on the bar, and that the growth extended to the shore, [presumptively Island 25] "and from there out to the river there is scattered vegetation. . . . You will find [cottonwood and willows] all over the bar. . . . During high water [it is probable that gas boats negotiate the area between Harshman's Island and Island 25], but no steamboat traffic has ever run there, to my knowledge. . . . Going to the house [on Harshman's Island] there would be no way to get there except by crossing water, or crossing a bare sand bar." [The testimony was given by deposition at Osceola September 7, 1943].

*Fifth.—Master's Report.*—After discussing mixed questions of law and fact, the Master concluded his review of appellants' claim that the land was in Tennessee with this statement: "If Island 25 were in Arkansas in 1916, then there could be no question of Harshman's

Island being in Arkansas, because the undisputed proof shows that the towhead [referred to by numerous witnesses] started west of the channel and east of the Island 25." A head note to Mr. Justice HUGHES' opinion in *Railway* v. *Ramsey*, 53 Ark. 314, 13 S. W. 931, 8 L. R. A. 559, 22 Am. St. Rep. 195, was used as a definition:— "A gravel bar in the bed of navigable river, over which steamboats in ordinary high water pass, which is distinguishable from the banks by the absence of soil and vegetation, is not alluvion added to the land of the riparian owner, *but belongs to the State*," the Italicized words having been omitted from the quotation.

It was the Master's understanding of Wunderlich's contentions that Harshman's Island was consummated from a beginning described by Herschel Mitcheson, who as a witness identified a point on the west bank of the river, where formation of a sand bar gradually extended downstream southeasterly. The point of beginning was approximately 2,600 yards north of the north line of Wunderlich's property—Island 25. Following extension of the bar into deeper water, and reappearance of the bar, alluvion accumulated, forming land— sometimes called an "outcropping." But the Master said that at low water a sand bar extended entirely around the property in question, barren of soil or vegetation. He believed this to be undisputed. While we do not think that this statement was uncontradicted, it is not difficult to agree that a preponderance of the evidence supports it.

The testimony and exhibits, according to the Master's views, disclosed that the land claimed by Cates had for some time been of substantial formation, and susceptible of cultivation. There was a further finding that the so-called sand bar was not attached to Wunderlich's property at any point. At extreme low water the *bar,* if not entirely barren, is from ten to twenty-five feet lower than well-defined banks of Island 25. "Certainly," said the Master, "[Harshman's Island] cannot be considered as accretion, as it did not form from defendants' land outward or away from it, but by filling in behind this bar toward [Wunderlich's] land. These

observations are made upon the assumption . . . that [Wunderlich's] theory [is] that the land in question is an outcropping on this bar extending out into the river. Land which begins forming at a bar or island in the river and [builds] toward the mainland is not accretion to the mainland.''

Many maps, drawings, surveys, plats, river bulletins, charts, photographs, copies of ancient publications, and other material documentation were introduced, including a table of conventional signs used in a reconnaissance of the Mississippi and Ohio Rivers by Capts. H. Young and W. T. Pouissin, topographical engineers, in 1821, and surveys by the Mississippi River Commission. These were intended to verify the appellants' belief that Harshman's Island was in Tennessee. They are of little help in determining how the island was formed.

In mentioning testimony given for appellants by St. George Richardson, a civil engineer of Memphis, the Master, discussing a statement by the witness that Harshman's Island was part of a sand bar ''attached to the mainland,'' said that from an examination of maps and charts to which Richardson referred, it was fairly inferable that the witness had in mind a sand bar connected with the mainland a mile and a half north of the Wunderlich property. The Master then said:

''It is my opinion that a sand bar now between Wunderlich's land [on Island 25, and Harshman's Island], filled in from the towhead toward the west chute of the river, and, as a matter of fact, has gradually filled in below the sand bar attached to the mainland north of Wunderlich's property, [and this process continued] until, of course, the chute between the mainland and the island has been narrowed perceptibly on both ends; but in ordinary high water there is still a well defined channel between the mainland and the island.''

Questions of fact have been decided against appellants by two Chancellors and a Master. A decree was rendered November 30, 1945, by Edward L. Westbrooke, Jr., Special Chancellor, whose right to act was challenged. The controversy on that point was decided in

Wunderlich's favor November 18, 1946. *Cates* v. *Wunderlich,* 210 Ark. 724, 197 S. W. 2d 482. On remand the entire case was retried on the record formerly made, supplemented by a motion to dismiss, the appointment of a Master, and the Master's report, upon which final adjudication was predicated. All have been carefully checked and compared.

A transparent map superimposed over a 1937 chart (referred to as Sheet 40) would place Harshman's Island partly within Secs. 17 and 20; but there is nothing persuasive to show, in respect of testimony given by Richardson, (other than deductions, speculation, and conclusions) that the island accreted to property owned by Wunderlich, that it formed within the original boundaries of lands owned by Wunderlich bordering on the river, or that it did not come into being as a towhead, separated completely from Island 25 by a channel or chute. True, testimony is in sharp disagreement regarding the nature of the channel; but the fact that Harshman's Island is somewhat connical—that is, it slopes gradually north, east, south, and west, from center—affords physical support to the suggestion that it gradually built as appellees claim. At least a preponderance of the evidence sustains this conclusion; hence the decree must be affirmed. It is so ordered.