2010 Ark. App. 190

**RIO VISTA, INC., Appellant**

**v.**

**Jim MILES and Patricia Miles, Appellees.**

**No. CA 09–199.**

Court of Appeals of Arkansas.

Feb. 24, 2010.

Joe M. Rogers, Fogleman & Rogers, West Memphis, for appellant.

Robert D. Stroud, Blair & Stroud, and Tom Thompson, Attorney at Law, Batesville, for appellees.

RITA W. GRUBER, Judge.

This quiet-title case involves competing claims to a narrow strip of land along the northeast bank of the Spring River at Hardy. The river is navigable and runs northwest to southeast. A common grantor once held the land on both sides of the river; in 1931, it conveyed some land to L.L. Ward and Frances Ward, which was "[b]ounded on the east by the North and East Bank of Spring River. . . ." The successors of the common grantor conveyed a tract on the other side of the river to Bridge North, Inc., which included a direction "to the Northerly Bank of Spring River; then run along said River Bank as follows: . . . to the Southerly right-of-way line of Burlington–Northern Railroad; then leaving said river bank. . . ." The common line, therefore, was the northeast bank of the Spring River.

In 1956, L.L. Ward, Jr., acquired his parents' property and recorded a plat of Rio Vista subdivision as drawn by W.D. Cobb. This plat indicated that the river and its islands were contained within Ward's property. It also reflected a handwritten notation on a line drawn near the northeast bank of the river, which stated: "Top Bank of River Property Line of L.L. Ward, Jr." Appellant Rio Vista, Inc., acquired Ward's land from a successor, James Bobo, in 1975. The legal description in its warranty deed referred to the recorded plat. Bobo gave appellant a quitclaim deed in 1980, which stated "per plat of W.D. Cobb. . . ."

In 1991, Bridge North subdivided its land on the other side of the river as Rio Vista III Addition. The platted lots reflected distances and pins set near, but not precisely on, the river bank. The plat

included the legal description running to the northerly bank of the river, and then along the river bank. The bill of assurance provided that Lots 1–29 were "riverfront lots." In two conveyances, appellees Jim Miles and Patricia Miles bought Lots 1, 2, 3, 4, and 5, Block 3, of Rio Vista III, in 2004 and 2005. Their deeds referred to the recorded plat. In July 2006, they filed this action against Rio Vista to quiet title to their lots, alleging that it had painted trees on their property along the river bank with purple paint. Appellees asserted that they are riparian owners of the land along the navigable river and that their southern property line is its ordinary high-water mark. Rio Vista counterclaimed for quiet title to the bed and banks of the river, and also asserted adverse possession and payment of taxes.

At trial, Jim Miles; Jane Clark, who owns a lot in Rio Vista III; and Jim Sitz, a surveyor, testified for appellees. Appellant presented the testimony of Hugh Monteith, James Harwood, and Neale Payne, who own property in Rio Vista; Kenneth Murphee, who owned property there from 1983 to 1995; and Ben Kittler, a surveyor. In the decree quieting title to appellees, the trial court noted that neither party could own the area below the ordinary high-water mark of the river because it is navigable. Using the definition of "ordinary high-water mark" set forth in *St. Louis, Iron Mountain and Southern Railway Company v. Ramsey*, 53 Ark. 314, 13 S.W. 931 (1890), the court ruled that Rio Vista did not own any property on the northeast bank of the river where it flows by appellees' lots. Regarding appellant's counterclaim, the court stated that the 1980 deed from Bobo, which interpreted the description in Ward's deed to mean the "top of bank," did not establish color of title to the disputed property. It also found that appellant failed to establish adverse possession. The court quieted title

in appellant to its property on the "south bank of Spring River" within Block 10 above the ordinary high-water mark. Appellant then brought this appeal.

We traditionally review quiet title and boundary line actions de novo. *Price v. Rylwell, LLC*, 95 Ark.App. 228, 235 S.W.3d 908 (2006); *Boyette v. Vogelpohl*, 92 Ark.App. 436, 214 S.W.3d 874 (2005). We will not, however, reverse findings of fact unless they are clearly erroneous. *Id.* Further, whether possession is adverse to the true owner is a question of fact. *White River Levee Dist. v. Reidhar*, 76 Ark.App. 225, 61 S.W.3d 235 (2001). We will not reverse a trial court's finding regarding adverse possession unless it is clearly erroneous. *Id.*

Appellant challenges the trial court's finding that appellees' riparian property line was the ordinary high-water mark of the river, and argues that the trial court disregarded the deeds of conveyance in appellees' chain of title. For example, appellees' 2004 deed transferred the lots "per recorded plat." Appellant asserts that the measurements and corner stakes shown on that plat indicated that appellees' lots fell short of the river, and that the trial court ignored an established principle of surveying, that a deed's references to a plat will give a true description. It also argues that the trial court erroneously reformed the deeds in appellees' chain of title, even though appellees did not seek that relief and did not include their predecessors in title, who were necessary parties. We disagree with all of these contentions.

The only parties with an interest in this proceeding were before the court. The trial court did not reform appellees' deeds, or those of their predecessors in title; it simply interpreted them. When interpreting a deed, the court gives pri-

mary consideration to the intent of the grantor. *Winningham v. Harris,* 64 Ark. App. 239, 981 S.W.2d 540 (1998). When the court is called upon to construe a deed, it will examine the deed from its four corners for the purpose of ascertaining that intent from the language employed. *Id.* As explained below, the trial court's interpretation of the deeds involved in this case was correct.

Appellant argues that its eastern boundary was "the top of the bank," as noted on Cobb's plat, and that the trial court erred in finding that its deed from Bobo did not convey title to the land between the high-water mark of the river and the top of the northeast bank. We disagree. The experts testified that the handwritten notation was an interpretation of the boundary line, not a description of the property conveyed. Jim Sitz testified that none of the deeds in evidence supported appellant's claim to the land between the high-water mark and the top of the northeast bank of the river. He said that the bank of the river is customarily the high-water mark and that he had never located a boundary as the top of the bank. There is no dispute that Newell platted the boundaries of Lots 1–5 as short of the high-water mark. Sitz, however, testified that the pins did not define appellees' southern boundary, because he believed that they were offset and reflected a meander line, due to the difficulty of setting pins at the river's edge. He opined that the high-water mark of the river constituted the actual southern boundary of appellees' lots.

Additionally, even if the notation on Cobb's plat was meant to describe what was conveyed, appellant's grantor could not have conveyed the strip of land between the river bed and the top of the northeast bank if he did not already own that land. *Parker v. Bowlan,* 242 Ark.

192, 412 S.W.2d 597 (1967). In appellant's chain of title, there is no conveyance beyond the northeast bank of the river; its claim is derived solely from Cobb's notation on his plat, which contains no legal description. In fact, appellant's expert, Kittler, testified that Cobb's notation was an interpretation and that there was no deed in the chain of title to support it. He acknowledged that Cobb could not expand Ward's land, if described in a deed as bounded by the north and east bank of the river, by drawing a plat. In reaching its decision, the trial court decided what property appellees' and appellant's grantors actually owned, and decided that appellees', not appellant's, predecessors had title to the land along the northeast bank; in doing so, it interpreted the deeds in keeping with long-established rules of property law.

The rights of the riparian landowner have been fixed as a rule of property for many years. The state holds in trust for the public those lands in the bed of all navigable waters below the ordinary high-water mark. *Hayes v. State,* 254 Ark. 680, 496 S.W.2d 372 (1973). The riparian owner holds all of the property rights above that line. *Id.* In *St. Louis, I.M. & S. Railway Co.,* 53 Ark. at 322, 13 S.W. at 933, the supreme court set forth the acknowledged test for determining the location of the "ordinary high-water mark":

In *Howard v. Ingersoll,* 13 How. 381 [14 L.Ed. 189], Mr. Justice Curtis gave a satisfactory definition of the bank and bed of a river. He says: "The banks of a river are those elevations of land which confine the waters, when they rise out of the bed; and the bed is that soil so usually covered by water as to be distinguishable from the banks by the character of the soil or vegetation, or both, produced by the common presence

and action of flowing water. But neither the line of ordinary high-water mark, nor of ordinary low-water mark, nor of a middle state of water, can be assumed as the line dividing the bed from the banks. This line is to be found by examining the bed and banks, and ascertaining where the presence and action of water are so common and usual, and so long continued in all ordinary years, as to mark upon the soil of the bed a character distinct from that of the banks, in respect to vegetation, as well as in respect to the nature of the soil itself. Whether this line between the bed and the banks |₇will be found above or below, or at a middle stage of water, must depend upon the character of the stream.... But in all cases the bed of a river is a natural object, and is to be sought for, not merely by the application of any abstract rules, but as other natural objects are sought for and found, by the distinctive appearances they present; the banks being fast land on which vegetation, appropriate to such lands in the particular locality, grows, wherever the bank is not too steep to permit such growth, and the bed being soil of a different character and having no vegetation, or only such as exists when commonly submerged in water."

▮ That appellees' deeds referred to Newell's plat did not limit their lots to a line short of the river bank. The plat contained the same language referring to the river bank as did the deed to Bridge North, which platted the property. The river was the natural monument, and it controlled, as Sitz testified. Arkansas law is clear that in deeds, quantity yields to course and distance, and course and distance to artificial and natural objects. *Wyatt v. Arkansas Game & Fish Comm'n*, 360 Ark. 507, 202 S.W.3d 513 (2005).

▮ Appellant also contends that the trial court erred in rejecting its claim of adverse possession. To prove the common-law elements of adverse possession, a claimant must show that he has been in possession of the property continuously for more than seven years and that his possession has been visible, notorious, distinct, exclusive, hostile, and with the intent to hold against the true owner. *White River Levee Dist. v. Reidhar, supra.* It is ordinarily sufficient proof of adverse possession that the claimant's acts of ownership are of such a nature as one would exercise over his own property and would not exercise over the land of another. *Id.* The statutory requirements for adverse possession were amended in 1995, requiring the party seeking adverse possession to show color of title and the payment |₈of taxes to the land in dispute, or to contiguous land, in addition to all of the elements necessary under existing adverse possession. *See* Ark.Code Ann. § 18–11–106 (Supp.2009). Because appellant's land was separated from appellees' by the river, which belongs to the state, the parcels were not contiguous. *See Patrick v. McSperitt*, 64 Ark. App. 310, 983 S.W.2d 455 (1998). In *Schrader v. Schrader*, 81 Ark.App. 343, 101 S.W.3d 873 (2003), we held that, if the claimant's action accrued before 1995, the effective year of the amendment, the requirement of payment of taxes was not necessary.

▮ Appellant first argues that it established adverse possession because it paid taxes on Block 10 (not just a portion of it) from 1976 through 1984. When one cannot show a perfect title to unimproved and unenclosed land, he may establish a prima facie title by showing that he has color of title and that he has paid taxes on the property for seven consecutive years. Ark.Code Ann. § 18–11–102 (Repl.2003). The possession contemplated by this stat-

ute has the same effect as if the person paying the taxes had been in actual, adverse possession of the land for the full seven-year period. *Appollos v. Int'l Paper Co.*, 34 Ark.App. 205, 808 S.W.2d 786 (1991). Appellant's payment of taxes, however, was irrelevant because the trial court correctly ruled that appellant did not have color of title to the land in dispute. As the experts testified, the deeds in appellant's chain of title did not purport to pass title to this strip of land. *See Weast v. Hereinafter Described Lands*, 33 Ark. App. 157, 803 S.W.2d 565 (1991).

Appellant further argues that it established the common-law elements of adverse possession through the testimony of Monteith, Payne, Murphee, and especially Harwood, who said that he had posted the property as private and observed such posting by others from the early 1960s until 2005. Harwood, who is fifty-four, testified that he had posted the top of the bank every three or four years since he was thirteen, and that he blazed the trees in 2005. Monteith stated that "no trespassing" signs were posted about four times in the past thirty years; that none were posted in the 1990s; and that, within the past ten years, the lines were blazed only once, in 2005. Payne had no knowledge of such posting in the 1980s, and admitted that some of the Rio Vista III owners had built walkways down to boat docks on the river. Murphee could not recall the trees being painted after 1989.

Appellant presented no evidence that anyone on its behalf had cleared or maintained any of the disputed strip, or had otherwise communicated its claim to any of the Rio Vista III property owners. Jim Miles testified that he saw no evidence of any adverse claim before he bought his property, and that if he had, he would not have bought it. Jane Clark, who bought her lot in 2002, also said that she saw no

evidence of an adverse claim. Although appellant did take some actions to demonstrate its claim to the property, the trial court did not consider them to be sufficiently visible, notorious, or distinct to vest title. Actual adverse possession is not proven by acts that are merely fitful. *See Broadhead v. McEntire*, 19 Ark.App. 259, 720 S.W.2d 313 (1986). In view of the deference we give to the trial court's findings of fact, we also affirm on this point.

Affirmed.

VAUGHT, C.J., and KINARD, J., agree.