Abrom STEWART *v.* Joe STEWART

CA 99-1402 37 S.W.3d 667

Court of Appeals of Arkansas
Division IV
Opinion delivered February 14, 2001

*Lessmeister Law Firm,* by: *James J. Lessmeister,* for appellant.

*Mickey Buchanan,* for appellee.

JOHN F. STROUD, JR., Chief Judge. This is an appeal from the Sevier County Chancery Court, which found that there was clear and convincing evidence of the making and performance of an oral contract for the sale of real property and which granted specific performance. We cannot say that the chancellor was clearly erroneous, and we affirm.

The parties in this case are brothers who were partners in two real estate deals. Joe Stewart, appellee, purchased "the Coulter house" in 1983 for $27,000. He was the sole owner of the Coulter house until he sold a one-half interest to Abrom Stewart, appellant, on January 27, 1984. Appellee alleges that the parties reached an agreement in September 1995 wherein appellant would sell his half of the Coulter house back to appellee. Appellee said the agreement was that he paid appellant a $2,000 cash down payment and appel-

lant was to finance the balance at eight percent interest over a three-year period which, made the monthly payments approximately $313. According to appellee, the agreement was made in the office of an attorney whom the parties used to handle some of their business, including the Coulter house. The parties also equally owned an apartment building together called the Rabb Apartments. While there is no issue on appeal regarding the apartments, they are mentioned frequently because some of the finances for both properties were commingled.

The Coulter house burned in May 1997, and the insurance policy in effect at the time of the fire was in appellee's name only. Appellee received over $80,000 from the insurance company. At the time of the fire, appellee had not completed the payments under the alleged contract. He said that he still owed appellant $8,000, and he transferred this amount to appellant's bank account from the insurance proceeds. Appellant refused to give appellee a deed for his half of the property and denied that there ever was a contract. Appellee sued for specific performance. Appellant counterclaimed for $41,175, which was half of the insurance proceeds, and for $9,000 for waste that he alleges appellee committed in regards to the apartments the parties held jointly. After a hearing on the issues, the trial court ordered appellant to convey his half interest in the property to Joe Stewart within thirty days.

Appellant raises two issues on appeal. He argues that there was neither payment nor possession by Joe Stewart to take the alleged oral contract outside the statute of frauds, and that, as tenants in common, Joe Stewart had a fiduciary duty to pay him half of the insurance proceeds.

Appellant argues four subpoints under the first issue: (1) that there was no written document; (2) that there was no clear and convincing evidence of payment of the alleged contract price of $12,000; (3) that money paid to Abrom Stewart was not reflective of the alleged terms of the oral contract; and (4) that Joe Stewart did not have possession evincing the birth of a new estate.

The statute of frauds in Arkansas is found at Arkansas Code Annotated section 4-59-101(a)(4) (Supp. 1999), and in pertinent part provides:

> Unless the agreement, promise, or contract, or some memorandum or note thereof, upon which an action is brought is made in

writing and signed by the party to be charged therewith, or signed by some other person properly authorized by the person sought to be charged, no action shall be brought to charge any: ... (4) Person, upon any contract for the sale of lands, tenements, or hereditaments, or any interest in or concerning them....

 To take an oral contract out of the statute of frauds, the making of the oral contract and its performance must be proved by clear and convincing evidence. *Dolphin v. Wilson*, 328 Ark. 1, 942 S.W.2d 815 (1997). However, a requirement that the evidence be clear and convincing does not mean that the evidence be uncontradicted. *Johnston v. Curtis*, 70 Ark. App. 195, 16 S.W.3d 283 (2000). Clear and convincing evidence is evidence by a credible witness whose memory of the facts about which he testifies is distinct, whose narration of the details is exact and in due order, and whose testimony is so direct, weighty, and convincing as to enable the fact-finder to come to a clear conviction, without hesitation, of the truth of the facts related. *Jablonski v. Jablonski*, 71 Ark. App. 33, 25 S.W.3d 433 (2000). Partial performance of a contract by payment of a part of the purchase price and placing a buyer in possession of land pursuant to an agreement of sale and purchase is sufficient to take the contract out of the statute of frauds. *Dolphin, supra.* *Dolphin* differs from the case at bar because the only evidence in that case primarily consisted of the competing testimony of the parties. *Id.*

 We review chancery cases *de novo* on the record, but we do not reverse a finding of fact by the chancellor unless it is clearly erroneous. *Norman v. Norman*, 342 Ark. 493, 30 S.W.3d 83 (2000). A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been committed. *Id.*

Here, appellant argues that there is no written document and no evidence that appellee paid the $12,000. Appellant testified that he obtained his interest in the Coulter house and Rabb Apartments by deed, and that he assisted his brother Joe by putting $5,000 down on the Coulter house. He said that appellee lived in the house along with his girlfriend and her children; that in return for staying in the house, appellee agreed to maintain the upkeep on the house as well as the insurance and taxes; and that the 1983 purchase price of the house was $27,000 but that it had a market value excluding the land of $30,000. He argues that there is no promissory note and

no mortgage, no deed, and no written memorandum, and that therefore the alleged sale violates the statute of frauds. In order for a memorandum to satisfy the statute of frauds, appellant argues that it must provide all the essential terms of the agreement, that a description of the land is an essential element, and that the land cannot be identified by oral testimony.

Appellee called Bill Hodge, the attorney who handled mutual affairs for the parties, to testify as to the existence of the oral contract. Mr. Hodge testified that he did represent the parties in a mortgage foreclosure on the Rabb Apartments and that the parties also owned the Coulter property. Mr. Hodge said that he collected the rent from the tenants of the Rabb Apartments for the Stewart brothers and would send them checks after all expenses were paid on the apartments. He testified as follows regarding the Coulter property:

> [T]hey were in the office and told me that they had made a deal with each other that Joe was buying Abrom's half interest in the Coulter place, and they had been out to see a local realtor named Glen Hannigan, who is now deceased.... and she had gone to look at the Coulter House for them and had given them her idea of what the property was worth, and they had agreed on a total value of the property, I believe it was $24,000.
>
> So Joe was gonna pay Abrom $12,000, and on the time that they came to see me about that, Joe had either already paid Abrom $2,000 of it leaving a $10,000 balance or they had made arrangements to pay. I'm not sure whether he had actually paid Abrom yet or not, but for some, but $2,000 of the 12 was satisfied, and they were gonna pay out the other $10,000....
>
> That's a photocopy of a yellow legal pad sheet of notes that I made during that meeting that I was just describing when Joe and Abrom Stewart came into my office and told me about the deal they made for Joe to buy Abrom's half of the coulter property.... It says, "$24,000," and then in parenthesis right after that, $12,000, and then underneath I wrote, "W.D. and MTGE" which is my personal notation for deed and mortgage, and then under that, I wrote "UNDIV period," and the "fraction one-half," and over. [UNDIV] for the undivided one-half interest which is what was being sold, and then over to the right hand side I've got 8%, which is the interest rate that they had told me they had agreed to for the pay-out, and then it says, "313 times 36," and then right below that, parenthesis, "three paid now," close parenthesis, "October,

November, December," and then there's a line, and then under that I wrote, "Abrom dash wife," with a question mark and a couple of lines under it....

Well, I told them that we'd need to do a deed and a mortgage to take care of this pay-out that they told me about, and I didn't know Abrom's wife's name and I asked him, I said, "I'll need to put your wife's name on here," and when I told him that he and Joe together, and I honestly can't recall now exactly who said specifically what, but the gist of it was, and I think Abrom said to me, "Well, I'm gonna have to get back to you on that." And there was a comment by Abrom or Joe, and I can't tell you which one made the comment, that Abrom was having woman troubles, and I believe that might have been the phrase used or maybe wife troubles, I don't know, but some kind of domestic problem, and for that reason he didn't want to give me the wife's name to use to prepare that deed at that time.... I made notes on that note pad of the amount; that $313 was an amount that I got out of the amortization table I had in my desk drawer ... $313 is what it takes to amortize a $10,000 obligation at 8% interest over whatever period that was, I can't recall now what it was.

Mr. Hodge stated that appellee would send the payments to him and he would in turn either apply the payments to expenses on the Rabb Apartments or send them to appellant. Mr. Hodge stated that he received three payments from appellee but that he sent only two to appellant and applied the third to expenses for the Rabb Apartments.

Appellant denied that the signatures on the backs of the above checks were his, but he admitted that the social security number on them was his. He also said that he was not in DeQueen on the day those checks were cashed. Mr. Hodge admitted that he was not familiar enough with Abrom Stewart's signature to say that the signatures on the backs of the checks were actually appellant's. However, Mr. Hodge also testified that he had written checks to Abrom Stewart from his trust account for the Rabb Apartments, and that the back sides of the canceled checks were signed "Abrom Stewart" and contained Abrom Stewart's social security number.

Mr. Hodge testified that he quit making payments to Abrom Stewart well before the house burned, even though Joe Stewart would bring the payments to him. He said he put the money into his trust account but after the first couple of payments they were running low on tenants in the apartments and also had some

extraordinarily high expenses. Mr. Hodge said he had no indica-
tion that there was any problem between Joe and Abrom during this
time. He said that after the house burned Joe Stewart collected the
insurance and it was then that the brothers got into their dispute.
Mr. Hodge admitted that he did not see Joe give Abrom the $2,000,
that there is no note or mortgage, and that sometimes clients do not
follow through with agreements. He said the Stewarts never hired
him to prepare the necessary papers for the Coulter house, but they
just told him about their deal. Mr. Hodge said that both parties
asked him to handle it, and that had he finished the deal he would
have sent both of them a bill. He said they asked him to do the
work but he never got to do it because they never gave him the
information to complete the work. He specifically said that appel-
lant told him he would get back with him regarding his wife. Mr.
Hodge said that both parties provided him with the amounts and
the interest rate. He admitted that he did not consult appellant in
advance about applying the Coulter house payments to the Rabb
Apartment expenses.

He said that appellant was with appellee when they told him
about the appraisal and that he got the information regarding the
$24,000 and the $12,000 from Joe and Abrom. He said that prior
to the fire, appellant never questioned him about the purpose of the
$313 payments.

Appellant said that when he bought the Coulter house with
his brother, he did so as an investment and he made a $5,000 down
payment on it and in 1987 a balloon payment became due and he
paid $7,000 on that and his brother paid $3,000. He said he never
discussed selling his interest in the house with his brother. He said
they discussed selling the Rabb Apartments, and during those dis-
cussions they addressed the value of the Coulter house but they did
not arrive at a figure. Appellant said he never met with a real estate
lady nor did he speak with anyone about an appraisal.

Appellant admitted he went with his brother to Mr. Hodge's
office on September 18, 1995, but he said that they did not discuss
selling the Coulter house. Mr. Hodge said that at one time he did
ask his brother if his girlfriend might be interested in buying his half
of the property but that the discussion did not lead to anything.
Appellant said he signed a document authorizing the sale of the
Rabb Apartments for $12,000 or $16,000 and that was the purpose
of going to Mr. Hodge's office that day with appellee. Appellant

insisted that he never told Mr. Hodge that he wanted him to draw up a document of any kind for the sale of the Coulter house. Appellant said the reason appellee gave him the $8,000 was because he owed appellant the money for insurance and taxes paid and for down payments and balloon payments. When asked if he had anything in writing signed by appellee stating that he owed him the money, appellant testified that he did not, and that appellee figured the $8,000 on his own. Appellant said he has no idea how appellee arrived at the figure. He further testified that there never was a contract for the sale of the Coulter house and that appellee never gave him a $2,000 down payment. He also said that he filed for divorce in 1991, that he is not yet divorced, and that there was nothing that happened in 1995 that would have caused him to have a conversation about his wife. Appellant said he never received any payments for the sale of the Coulter house and he did not know anything about it until Mr. Hodge sent him an itemized letter showing payments received from appellee. Appellant testified that Mr. Hodge sent the letter at his request after the house burned and that it was in response to appellant's inquiry about the insurance money. In support of his argument that appellee owed him the $8,000, appellant produced receipts and canceled checks for payment of insurance, taxes, and expenses for either the Coulter house or the apartments, and he claimed that appellee owed him for these expenses. Appellant also produced a handwritten note that he said appellee sent him. The note read, "Here's your statement that came in July and the $8,000.00 deposit I made on August 8. Your statement also show[s] the interest your account is earning." The note was signed "Joe."

Appellant testified that he knows he did not cash the checks that Mr. Hodge testified he sent because the checks were cashed in DeQueen, Arkansas, on December 15, 1995, and that he was not in DeQueen on that day. He testified that the signatures are forgeries. Appellant also said he was with his other brother that day in Shreveport, and he produced a receipt dated December 15, 1995, as proof that he paid for car repairs he had done in Shreveport that day. Appellant's wife's name is also on that particular credit card but appellant said she has not had access to his credit card since 1981 when they separated. Appellant said it is possible for him to be in DeQueen and Shreveport on the same day but he said, "[A]t the time my brother picked me up and the time I picked up my - I stayed with him all day - at the time that he dropped me off to pick

up my car, it was impossible for me to come to DeQueen and be back and do what I done." He admitted that there have been several times when he was in both DeQueen and Shreveport on the same day. Appellant testified that when they bought the Coulter house the mortgage payments were $350 and the Coulter house was paid for by the Rabb Apartments, but he failed to offer any evidence of this or any evidence that he himself made any of the payments.

On the issue of whether appellant cashed the two checks from Mr. Hodge in DeQueen, the parties' other brother, Robert Stewart, testified that he cannot specifically say that appellant was with him in Shreveport on December 15, 1995, but that they were together the day appellant had his car fixed. He also testified that appellee told him prior to the fire that appellant was going to sell him his one-half interest in the Coulter house.

Appellee testified that the mortgage payments on the Coulter house were $356 monthly and that he made all the payments for five years except for the $7,000 appellant paid on the balloon payment. Appellee said he paid $3,200 on the balloon payment. Appellee testified that appellant told him he wanted to sell him his interest in the Coulter house because he and his wife were separated and he did not want her to have anything. He said it is not true that the Rabb Apartments paid the note on the Coulter house. Appellee said he agreed to buy appellant's half-interest so they went to see Bill Hodge. He said he had the house appraised and discussed it with appellant prior to their meeting with Mr. Hodge. Appellee said he told appellant that the appraiser said she could put it on the market for $24,000 but it would probably sell for $21,000. Appellee said appellant's response was that he wanted to get $24,000 for it. During the meeting with Mr. Hodge the parties told him the house appraised for $24,000. Appellee said they explained to Mr. Hodge that appellee paid $2,000 down and that appellant would carry the note for the $10,000 balance. Appellee said Mr. Hodge calculated the note and interest and told them the payments would be $313 per month. Appellee said appellant agreed to the price and that Mr. Hodge made notes of the meeting. Appellee said that Mr. Hodge sent some payments to appellant and applied the rest to the Rabb Apartments. He also said Mr. Hodge explained to him that he would keep a record of the payments and that appellee would have to reimburse appellant for half the money applied to the Rabb

Apartments for expenses since appellee was a joint owner of the apartments. Appellee said he notified his brother within forty-eight hours of the fire at the Coulter house and that they discussed paying off the balance of the $10,000 appellee owed appellant. Appellee said he went to Washington for the Fourth of July to visit appellant and appellant said, "Well, you got the money now. Pay me off." Appellee said he explained to appellant that he had to wait until the insurance check cleared and that he transferred the money to appellant's account shortly thereafter. Appellee said the $8,000 was for the balance of the money he owed appellant on the Coulter house but appellant refused to give him a deed. He said appellant's checks were for his share of the insurance and taxes only and that he did not borrow any money from appellant. Appellee testified that check number 1009 for $540, which appellant says was for insurance and taxes on the Coulter house, was actually paying appellee for a lottery ticket he had won and that appellant agreed to cash for him. Appellee said he cashed the check but when he saw the canceled check it had "insurance" written in the memo section. He said appellant never told him he owed him anything on the Rabb Apartments. Appellee said he also paid notes on the apartments and he worked on the apartments and that he cut the yard, trimmed the trees, and repaired the apartments but was never paid a quarter for it. Appellee said he did not forge any checks on Abrom Stewart and that he paid just as much in taxes as appellant claims he paid.

Appellee stated that all of his documents burned in the fire. Appellee said he sent the payments owed to appellant to Mr. Hodge at appellant's request. Appellee testified that at the time he was making payments to appellant on the Coulter house he was also repairing things, and that he paid some odd amounts because he was paying for the repairs out of his pocket. He testified that the insurance was in his name because he insured it when he was the sole owner and that when appellant became a joint owner, he continued making the insurance payments and he did not change the insurance papers to reflect appellant as an owner. Appellant testified that after the fire the insurance paid approximately $82,000, including $25,000 for the contents and $57,000 for the house. He said the contents belonged to his girlfriend, Betty Boyles, so he gave her the $25,000. Appellant said he agreed to pay his brother $12,000 for his half interest and he actually paid him $12,700 including a $2,000 down payment, $2,700 in payments to Mr. Hodge and $8,000 from the insurance.

In the instant case, in addition to the conflicting testimony of the parties, there was testimony by Mr. Hodge, the attorney who said he met with the parties in his office to discuss the agreement between the parties for the sale of the Coulter house. Mr. Hodge also testified that appellant agreed to sell his share to appellee for $12,000; that the parties said appellee had already taken care of the $2,000 down payment; that appellant would carry the note for the $10,000 balance, payable over thirty-six months at eight percent interest; and that the monthly note would be $313. Mr. Hodge also testified that prior to the fire, appellee had sent him some of the monthly payments and that he in turn had sent some of those payments to appellant and applied the rest to expenses on the Rabb Apartments.

■ There was also testimony from both appellee and Mr. Hodge that appellant told Mr. Hodge he was having domestic problems and would get back to Mr. Hodge with information regarding his wife so Mr. Hodge could prepare the necessary paperwork. On our review of the record, we cannot say that the chancellor was clearly erroneous in finding that the total amount agreed upon was paid.

■ We now turn to the issue of whether there was possession enough to satisfy that requirement for removing an oral contract from the statute of frauds. Appellant relies on *Lynn v. Martin*, 166 Ark. 296 (1924), in which our supreme court held that possession, to have the effect of taking the case out of the statute, must be exclusive, evincing the birth of a new estate, and distinguished from the continuation of an old one, and must not be referable to an antecedent right. The supreme court addressed this issue again in *James v. Medford*, 256 Ark. 1002, 512 S.W.2d 545 (1974), wherein it held that when one is placed in possession, as that term is used when applied to taking a contract outside the restrictions of the statute of frauds, it means such possession as would permit the exclusion of others.

The facts in the instant case show that appellee lived in the house with his girlfriend and her children continuously from a time prior to the alleged contract until the house burned in 1997. There is no question that appellee did not move out and move back into the house at the time of the agreement. However, although appellee's presence in the house was continuous, as the chancellor pointed out, there is no evidence that appellant made demands on

appellee to remove himself or his girlfriend from the home at any time. Moreover, the court found that appellant did make an oral contract, so appellant had knowledge that appellee claimed ownership of the house and was living in the house under that claim.

> Since the basis of the doctrine of part performance is fraud or inequitable conduct on the part of the person sought to be charged on the oral contract, it is well settled that the acts or part performance by the plaintiff, in order to entitle him to the enforcement of an oral contract, must have been performed with the knowledge and consent or acquiescence of the defendant.

73 Am. Jur. 2d *Statute of Frauds* § 410 (citations omitted).

In the instant case, the trial court found that the appellant had actual notice that his brother was living in the house under a claim of full ownership because appellant made an oral contract for the sale of the property and appellant accepted the payments.

> It is said that if the purchaser came in as a tenant, he must show by unequivocal proof that the tenancy was abandoned, and that his possession as a tenant was changed into that of a purchaser under the specific contract he is seeking to enforce. Indeed, it has been stated that to refer his continued possession to the oral contract of sale, the tenant must make a formal surrender of his possession under the lease and resume possession under the contract of purchase. Most of the courts, however, support the view that re-entry is not necessary to show a change from possession as tenant to possession as purchaser, where there are other acts showing the change in the nature of the possession. All the circumstances which tend to characterize the continued possession are to be considered with reference to whether possession is in reliance on the contract.

> Among other acts and circumstances which are deemed to refer the continuation of the pre-existing possession to the contract of purchase, the making of substantial, permanent, and valuable improvements, or payment of or upon the purchase price, or both the making of such improvements and the payment of purchase money, have been held to show a change in the nature of the pre-existing possession and to refer it to the contract of purchase. The fact that the purchaser is already in possession of the land or a part thereof when the contract is made does not deprive such acts of part performance of their efficacy.

73 Am. Jur. 2d *Statute of Frauds* § 416 (citations omitted).

Although Arkansas law follows the rule that the possession must evince a new estate, based on the facts in this case we cannot say that the chancellor was clearly erroneous in making the following findings:

> The Court is in a position to view the witnesses along with the introduction of evidence and exhibits and must make determination of the credibility of the witnesses....

> Based upon the demeanor of the Defendant, his testimony, his version of the facts, and his lack of explanation of the receipt of several thousand dollars, denial of receipt of checks having his endorsement, and other inconsistencies in his testimony, the Court finds that he is not a credible witness.

> The Court finds by clear and convincing evidence that there was a making of an oral contract and of its performance. The Court is fully convinced that there was a contract made between the parties for the sale of the Defendant's one-half interest in the Coulter property to his brother and that the Defendant fully expected his brother to make payment of same. The contract would have been reduced to writing in the form of a note and mortgage had it not been for the Defendant's request to wait on same due to problems with his wife. He cannot now be heard to complain of lack of writing caused by his own delay. The Court finds that full consideration has been paid by the Plaintiff, Joe Stewart, and that he took possession of the Coulter property upon making and purchase of the property in the form and nature expected of one who has complete ownership of property....

■ The facts relevant to this issue show that an agreement was made for appellee to buy appellant's share, that appellee made all payments under this agreement, and that the only reason a note and mortgage were not prepared was because appellant asked Mr. Hodge not to prepare the documents. Based on the chancellor's findings, appellant made the oral contract and therefore had knowledge that appellee was living there under claim of full ownership. Now that the house has burned and the insurance company has paid appellee substantially more than what the parties agreed was the value of the house, appellant wants half the insurance proceeds. Under these facts, we cannot say that the chancellor was clearly erroneous in finding that there was a binding contract.

Appellant's second issue is that, as tenants in common, Joe Stewart had a fiduciary duty to pay him half of the insurance

proceeds. We do not reach this issue because we affirm the trial court on the first issue.

Affirmed.

BIRD and VAUGHT, JJ., agree.