SMOTHERMAN *v.* BLACKWELL.

5-153                              261 S. W. 2d 782

Opinion delivered October 26, 1953.

Rehearing denied November 30, 1953.

---

*Kaneaster Hodges*, for appellant.

*Pickens & Pickens* and *Wayne Boyce*, for appellee.

GEORGE ROSE SMITH, J. This dispute involves the ownership of a narrow strip of ground described as the east five and a half feet of Lot 1, Block 9, Dill's Second Addition to the City of Newport. The record title is in the appellees, Mr. and Mrs. Blackwell; but the principal plaintiff-appellant, Vernon L. Smotherman, who owns the adjoining Lot 2, contends that the parties' deeds should be reformed to vest in him the title to the strip in controversy. The chancellor found that although there may have been mutual mistakes as between certain predecessors in the two chains of title, the Blackwells as *bona fide* purchasers acquired title free of Smotherman's equitable right to obtain reformation.

The testimony establishes beyond question that mutual mistakes did occur. When Block 9 was platted in 1911 the north half of the block consisted of eight lots fronting on Malcolm Street to the north. Lots 1 to 7 were each fifty feet in width, but Lot 8 on the east end of the block was only forty-three feet and eight inches wide.

In 1943 the entire block, then unimproved, was bought by the Newport Development Company. To make up for the shortage in Lot 8 the company succeeded in having the city vacate the east five and a half feet of Cedar Street, which lies next to Lot 1 at the west end

of the block. The ordinance provided that title should revert to the abutting owner.

It was undoubtedly the company's intention to redivide the block by moving the lot lines five and a half feet to the west, so that Lots 1 to 7 would be fifty feet wide and Lot 8 forty-nine feet two inches. By an oversight, apparently due to the death of the company's president, no revised plat of the block was filed for record, but the company acted upon the belief that the block had been replatted. Eight houses were built, each in the center of a lot as redrawn. A surveyor prepared and certified as correct an individual plat of each lot, showing each house to be centrally located. In reliance upon these plats a federal agency insured mortgages upon each house, in the belief that the houses were far enough from the property lines to comply with its requirements.

In 1944 the development company began selling the houses to the public. Those original purchasers who testified at the trial say that an officer of the company showed them the property and represented the lots to be fifty feet wide, with the houses situated midway between the side lines. A company official corroborates this testimony. However, the various deeds given by the development company described the lots by number only, and, of course, this is the mistake sought to be corrected. We are convinced that both the development company and its vendees intended to contract in accordance with the lines staked out by the company's surveyor. During the succeeding years the various owners of the eight lots have acted upon the same assumption, constructing their fences, garages, driveways, etc., with respect to the lines that every one believed to be correct. We think it perfectly clear that the original parties acted under a mutual mistake and that all succeeding owners have had the same misconception.

Nevertheless the law permits the Blackwells, by claiming the strip now in question, to dislocate property lines all along the block, unless the proof shows that the Blackwells had notice of Smotherman's equity when they

purchased Lot 1 from James P. Young in July of 1948. On this issue the evidence preponderates in favor of Smotherman. At the time of the Blackwell's purchase there was a fence along more than half of the boundary between Lots 1 and 2, situated approximately on the line now contended for by Smotherman. He had also put in a storm cellar that extended to within a foot of the fence. Even Mrs. Blackwell conceded on cross-examination that she ''supposed'' that Smotherman had possession up to the fence when she and her husband acquired Lot 1.

No dispute arose between these neighbors until the appellees had the line surveyed in either 1949 or 1950. Their surveyor relied only upon the 1911 plat of the addition, and we infer that for the first time the Blackwells learned that they had a claim to a fifty-five-and-a-half-foot lot. Smotherman, when told of the surveyor's findings, confessed some uncertainty as to the exact location of the boundary line, for the reason that his fence ran at an exact right angle to Malcolm Street, whereas all the plats show the lot lines as deviating by four degrees from a right angle. After some dispute about the survey this suit was filed by Smotherman and several other owners of homes within the block.

The appellees recognize the rule that hostile possession puts a purchaser on notice of the occupant's rights, but they insist that Smotherman's possession would not have ripened into title after seven years, since his fence extended only from the alley to a point opposite the rear of his house. The question, however, is not that of adverse possession; it is whether Smotherman's partial occupancy gives notice of his claim. In a case identical in principle, *Thalheimer* v. *Lockert*, 76 Ark. 25, 88 S. W. 591, we held that it does. There, as here, the description used in the deed was legally good, but it did not include all the land the parties had in mind. There, as here, the first grantee was in possession of only part of the omitted property when the common grantor sold to a third person. It was held that the second purchaser, being put

on notice by possession, took subject to the plaintiff's equitable right to obtain a reformation of his deed.

It is rather ingeniously argued that Smotherman's possession gave notice only of such facts as the Blackwells would have learned had they made inquiries of Smotherman himself, and in 1948 Smotherman was not aware of the mutual mistakes that had occurred some years earlier. The answer is that Smotherman's occupancy gave notice of the ultimate fact—that he claimed to own the land—and a landowner cannot be expected to recite offhand all the evidence that may be needed to establish his title. Had the Blackwells taken the precaution of having a survey made before they bought Lot 1 they would have learned of Smotherman's hostile possession, and they are charged with knowledge of such facts as would have been disclosed by a diligent investigation of his claim. Such an investigation would have led to the discovery of the past events that now entitle him to the relief prayed.

Reversed.

The Chief Justice and Justices McFADDIN and WARD dissent.