Gerald JOHNSTON and Bebe Dare Johnston *v.* Glen CURTIS and Deanna Curtis

CA 99-941                                    16 S.W.3d 283

Court of Appeals of Arkansas
Division I
Opinion delivered May 10, 2000
[Petition for rehearing denied June 21, 2000.]

*Rice, Adams, Beckham & Pulliam*, by: *Ben E. Rice*, for appellants.

*Clinton D. McGue*, for appellees.

SAM BIRD, Judge. Appellants Gerald Johnston and Bebe Dare Johnston bring this appeal from the Circuit Court of Lonoke County contending that the court erred in finding that the parties orally modified a written real-estate contract and that their non-performance of the contract was not excused. Appellees Glen Curtis and Deanna Curtis have cross-appealed, stating that the court should have awarded them "expectancy" and punitive damages.

We affirm the decision of the trial court on direct appeal and cross-appeal.

On October 9, 1997, the parties entered into a written real-estate contract, whereby the Curtises offered to sell and the Johnstons agreed to buy a house in Cabot for $114,000. A real estate agent was not involved. Under the terms of the contract, the transaction was subject to the Johnstons obtaining a home loan of $102,600, which was 90 percent of the purchase price. Specifically, the contract provided that the Johnstons' obligation was subject to:

> The Buyer's ability to obtain a loan secured by the property in an amount no less than $102,600, with Jan Turbeville at Arkansas Fidelity Mortgage Co., payable over a period of not less than __Years, with interest not to exceed __% per annum.

Deanna Curtis testified that after the Johnstons told her and her husband that they had been pre-approved for their loan, the Curtises purchased a home in Searcy, and they moved out of the home in Cabot after they signed the contract with the Johnstons. However, because the house appraised for only $110,000, the mortgage company denied the loan to the Johnstons. Thereafter, the parties entered into an oral agreement whereby the Johnstons agreed to buy and the Curtises agreed to sell the house for $110,000. On November 3, 1997, after the lease on the Johnstons' home in Hot Springs expired but before the parties closed on the house in Cabot, the Johnstons paid the Curtises $500, took "early possession" of, and moved into, the home in Cabot. Deanna Curtis testified that she and her husband allowed the Johnstons to move into the home before closing only after they had made "some kind of a show of good faith." The Johnstons tendered a check for $500 to the Curtises for the Curtises to hold until closing.

Jan Turbeville, a mortgage loan originator, testified that she had a difficult time obtaining a loan for the Johnstons, but that a loan for ninety percent of the purchase price was finally approved at the reduced price of $110,000, and the transaction was set for closing on November 17. She testified that when the loan was approved, the Johnstons were informed of the terms. She also testified that one of the terms of the loan was that Bebe Dare Johnston's name would not be on the title of the home, but that the title of the home would be in Gerald Johnston's name only. She also testified that during the initial meeting that she had with the

Johnstons, Gerald Johnston did not put any parameters on the type of financing that he would accept. In addition, she testified that he accepted the terms of the final loan for which he was approved. She stated that had Gerald Johnston not approved the terms of the loan, she would have neither set a closing date nor ordered any of the documents needed for closing.

Deanna Curtis testified that the parties were to close on the house on November 17, but that they were informed that day that the Johnstons had refused to close. Thereafter, the Curtises demanded that the Johnstons vacate the premise. The Curtises then listed the home with a realtor and sold the property in March 1998 for $100,000. Deanna Curtis testified that after deducting the six-percent commission, they received $94,000, less closing costs.

Gerald Johnston testified that the parties had entered into a real-estate contract, but stated that the terms of the agreement were that he purchase the home for $110,000 if he could obtain a loan at an acceptable rate of interest and acceptable closing costs. He stated that he had been led to believe by a mortgage lender that the interest rate would be between nine and ten percent. However, he admitted that the written real-estate contract did not state that the offer was contingent upon obtaining a loan with an interest rate between nine and ten percent. Johnston testified that he and his wife were originally set to close on the house on November 8 or 9, and that they showed up at the office to close, but that the papers were not ready. He said that he was told on November 17 that the closing would take place that afternoon, but at that time the mortgage company did not know the amount of the closing costs or the interest rate. He said that someone by the name of Brown called him later that afternoon and told him the interest rate and the amount of the closing costs and that they were beyond what he had discussed. Gerald Johnston told Brown that he and his wife were not interested. He said that he was quoted an interest rate of 10.75%, but that it was too high and that he was only interested in purchasing the house if he would obtain an acceptable interest rate. Gerald Johnston also stated that he was never informed, until the trial, that his wife was not going to be named on the deed, and he said that he would not have purchased the home without her name being included on the deed. He denied that Turbeville had several conversations with him concerning the transaction. Gerald Johnston stated that the $500 check he wrote to the Curtises when they

moved into the home was not earnest money, but was given to cover any damages that they might cause to the home. He stated that he stopped payment on the check because the Curtises were not acting in good faith.

The trial court found that the parties had orally modified their agreement to reduce the price from $114,000 to $110,000, but subject to all the other terms of the original contract, that the oral modification to the contract was not subject to the requirements of the statute of frauds, and that the Johnstons had breached the contract by their failure to close. Damages were awarded to the Curtises in the amount of $10,000, representing the difference between the modified contract price and the amount for which the Curtises later sold the house to someone else.

For appellants' first point on appeal, they argue that the court erred in finding that the parties had orally modified the written contract and that the oral modification was not barred by the statute of frauds. Appellants argue that there was not a meeting of the minds between the parties because they had not agreed on an acceptable loan amount, interest rate or closing costs. In the alternative, they argue that even if an oral contract existed, it violated the statute of frauds.

■ A meeting of the minds, or what is more commonly known as an objective indicator of agreement, see *Fort Smith Serv. Fin. Corp. v. Parrish*, 302 Ark. 299, 789 S.W.2d 723 (1990), does not depend upon the subjective understanding of the parties, but instead requires only objective manifestations of mutual assent for the formation of a contract. *Hagans v. Haines*, 64 Ark. App. 158, 984 S.W.2d 41 (1998). The meeting of the minds is essential to the formation of a contract and is determined by the expressed or manifested intention of the parties. *Id.* The question of whether a contract has been made must be determined from a consideration of the parties' expressed or manifested intention determined from a consideration of their words and acts. *Id.*

The Johnstons argue that the oral contract between the parties provided that they would purchase the home for $110,000 if they were given an acceptable interest rate and closing costs. After a consideration of the parties' words and acts, it is clear that the contract was modified from $114,000 to $110,000. Through their

testimony, both parties admit that they changed the terms of the agreement from the purchase prices of $114,000 to $110,000. They also state that those were the only terms changed. The original real-estate contract was silent as to what would constitute an acceptable rate of interest or acceptable closing costs. In addition, Turbeville testified that the Johnstons did not discuss with her what interest rate or amount of closing costs would be acceptable to them.

■ The Curtises argue that the statute of frauds is an affirmative defense and that the Johnstons are barred from arguing it as a defense because they did not specifically plead such in their answer. While it is true that the statute of frauds is an affirmative defense, *see* Ark. R. Civ. P. 8, the court in this case amended the pleadings to conform to the proof. Arkansas Rule of Civil Procedure 15(b) states, "When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings." In the case at bar, after the Curtises presented their case, the Johnstons made a motion to dismiss the case, the court denied the motion, stating that the pleadings were amended to conform to the proof, and it considered the issues of the applicability of the statute of frauds. Therefore, even though it was not raised in the Johnstons' answer, this court can address the defense of the statute of frauds.

■■ A contract for the sale of land comes within the statute of frauds and must be in writing to be enforceable. Ark. Code Ann. § 4-59-101 (Repl. 1996). A material modification of a contract comes within the statute of frauds and must be in writing in order to be valid and binding. *Shumpert v. Arko Telephone Communications Inc.*, 318 Ark. 840, 888 S.W.2d 646 (1994). Such a contract cannot be modified in essential parts by parol agreement so as to be valid against a plea of invalidity under the statute of frauds. *Id. See also Arkmo Lumber Co. v Cantrell*, 159 Ark. 445, 252 S.W. 901 (1923); *J.W. Davis v. Patel*, 32 Ark. App. 1, 794 S.W.2d 158 (1990). The court found that the statute of frauds did not apply in this case because a written agreement may be modified by an oral agreement. We disagree, but we affirm the court because, even though the trial court applied the wrong reason, it reached the correct result. *Van Camp v. Van Camp*, 333 Ark. 320, 969 S.W.2d 184 (1998).

■■ In the case at bar, the statute of frauds is not applicable because of the Johnstons' part performance of the contract. In order to remove an oral agreement from the statute of frauds, it is necessary to prove both the making of the oral agreement and its part performance by clear and convincing evidence. *Langston v. Langston*, 3 Ark. App. 286, 625 S.W.2d 554 (1981). A requirement that the evidence be clear and convincing does not mean that the evidence be uncontradicted. *Freeman v. Freeman*, 20 Ark. App. 12, 722 S.W.2d 877 (1987). Partial performance of a contract by payment of a part of the purchase price and placing a buyer in possession of land pursuant to an agreement of sale and purchase is sufficient to take the contract out of the statute of frauds. *Sossamon v. Davis*, 271 Ark. 156, 607 S.W.2d 405 (1980). In the case at bar, the parties orally modified the contract by changing the purchase price from $114,000 to $110,000. The Johnstons admit that they took possession of the home, and they admit to tendering a check to the Curtises for $500. In addition, Deanna Curtis testified that when the Johnstons requested to take possession of the home prior to closing, she and her husband asked the Johnstons to show their good faith by tendering the check for $500 before they allowed the Johnstons to take early possession of the home. The Johnstons' acts of taking possession of the property and paying a portion of the purchase price are sufficient to take the oral modification to the contract out of the statute of frauds.

For appellants' second point on appeal, they argue that the court erred in not finding that the contract between the parties was subject to conditions precedent that appellants obtain acceptable financing and acceptable closing costs. In addition, they argue that because Mrs. Johnston's name was not going to appear on the deed, another condition of their contract was not satisfied. They contend that because all of these conditions precedent were not satisfied, their failure to perform was excused.

■ Whether a provision of a contract amounts to a condition precedent is generally dependent on what the parties intended, as adduced from the contract itself. *Stacy v. Williams*, 38 Ark. App. 192, 834 S.W.2d 156 (1992). When the terms of a written contract are ambiguous and susceptible to more than one interpretation, extrinsic evidence is permitted to establish the intent of the parties and the meaning of the contract then becomes a question of fact. *Id.* Furthermore, evidence of a parol agreement that a written

agreement is being delivered conditionally constitutes an exception to the parol evidence rule. *Id.*

■ For this argument, the Johnstons rely on *Stacy v. Williams, supra.* However, that case is distinguishable from the one at bar because in *Stacy*, the parties made obtaining financing a condition precedent to the contract, and the appellees were never approved for any financing. In the case at bar, the Johnstons were approved for financing, but refused to close because they found the rate and the closing costs unacceptable. However, the original contract stated only that the Johnstons would receive a loan for $102,600, which was ninety percent of the purchase price. Although the contract form that the parties used contained a blank space where a limitation on the interest rate of their loan could have been inserted, it was left blank. The contract contained no mention of any limitation in the amount of the closing costs.

■ The Johnstons also argue that they should be excused from performing the contract because Mrs. Johnston's name was not going to be on the deed. However, the Johnstons did not become aware of that fact until the day of the trial, more than a year after they refused to perform the contract. They cannot rely on a fact of which they were unaware at the time of their breach as an excuse for their failure to perform. *See Barbara Oil Co. v. Patrick Petroleum Co.,* 566 P.2d 389 (Kan. Ct. App. 1977).

The Curtises have cross-appealed, contending that the court erred in not awarding them special and punitive damages. The court found that the Johnstons had breached the contract, and it awarded the Curtises $10,000, which represented the difference between the $110,000 purchase price agreed upon between the two parties and the $100,000 sale price that the Curtises accepted from another buyer several months later. The Curtises argue that they should also have been awarded damages for the $6,000 realtor's commission fee that they paid when their house eventually sold, that they should recover damages for interest on the mortgage, as well as taxes, hazard insurance and mortgage insurance that they were obligated to pay on their Cabot house until it was eventually sold, and that they should recover the rent they expended on their new residence in Searcy up until the time the Cabot house was sold.

■ The measure of damages for a vendee's breach of an executory contract for the sale of land is the difference between the contract price of the land and its market value at the time of the breach, less the portion of the purchase price already paid. *Williams v. Cotten*, 14 Ark. App. 80, 684 S.W.2d 837 (1985) (citing *McGregor v. Echols*, 153 Ark. 128, 239 S.W. 736 (1922)). In *McGregor*, the court wrote:

> In actions against a vendee on a contract for the purchase of real estate, we had supposed it to be a well settled rule that when a party agreed to purchase real estate at a certain stipulated price and subsequently refuses to perform his contract, the loss in the bargain constitutes the measure of damages, and that is the difference between the price fixed in the contract and the salable value of the land at the time the contract was to be executed.

153 Ark. at 132, 239 S.W. at 736.

■ ■ The court in *Williams v. Cotten, supra*, went on to state that the general rule does not prevent a party from ever recovering other damages flowing directly from a breach, and cited the expenses of abstracts of title and title opinions as examples of expenses that might be incurred in preparation for the sale for which a seller might recover damages. But the court specifically excluded expenses connected with the resale to third parties, such as a real-estate commission, monthly house payments, and utilities. The court in *Williams v. Cotten, supra*, found that these types of damages were not directly connected with a party's breached sale and were remote and speculative in that the ultimate or total amount for these items depends solely upon when the party consummated a resale. Because the Curtises were awarded the difference between the contract price with the Johnstons and the amount for which the Curtises eventually sold their Cabot house, we do not find that the Curtises are entitled to any other damages.

■ Regarding the Curtises's argument on cross-appeal that they should recover punitive damages, their complaint contained no prayer for punitive damages, they made no argument in the trial court that punitive damages should be awarded, and no authority is cited to this court why punitive damages should be awarded in an action for breach of contract. We do not consider arguments made for the first time on appeal, *Dobie v. Rogers*, 339 Ark. 242, 5 S.W.3d 30 (1999), or arguments not supported by convincing authority,

*National Bank of Commerce v. Dow Chem. Co.*, 338 Ark. 752, 1 S.W.3d 443 (1999).

Affirmed on direct appeal and on cross-appeal.

KOONCE and GRIFFEN, JJ., agree.