2010 Ark. App. 555

**Bryan MILLER, Appellant**

v.

**Michael A. NEIL, Sherry A. Neil and the McIntosh Group Realtors, Inc., Appellees.**

**No. CA 10–210.**

Court of Appeals of Arkansas.

Sept. 1, 2010.

Rehearing Denied Oct. 6, 2010.

Charles M. Kester, Mary A. Long, The Kester Law Firm, Fayetteville, AR, for appellant.

Chris Lisle, Lisle Rutledge P.A., Springdale, AR, for appellees.

LARRY D. VAUGHT, Chief Judge.

Appellant Bryan Miller appeals from the order of the Circuit Court of Washington County dismissing his complaint for trespass and ejectment against appellees Sherry and Michael Neil and finding in favor of the Neils on their third-party complaint for quiet title and reformation against the McIntosh Group Realtors, Inc. Miller argues that the trial court's order permitted the oral modification of a boundary line in violation of the statute of frauds and that the trial court abused its discretion when it permitted the introduction of inadmissible hearsay. We agree with Miller's first point on appeal; therefore, we reverse and remand.

In July 2008, Miller made an offer to purchase Lot 16 of the Harmon Trails Estates, a subdivision in Washington County, Arkansas. During the title-search process, he learned that there was a rectangular-shaped easement affecting Lot 16 that had been granted to the Neils, who owned the adjacent Lot 17. With this information, Miller requested another survey of Lot 16, which showed the Neils' easement that encroached on Lot 16, but it also revealed the Neils' lengthy fence line, a small building, and a concrete kennel run—all of which also encroached on Lot 16 well beyond the easement boundary. Despite his undisputed notice of the Neils' easement and encroachments, Miller purchased Lot 16 on September 5, 2008. As part of his purchase, he was given a Special Warranty Deed that stated that the property was subject to the rectangular-shaped easement for "ingress and egress" and title insurance that specifically excepted the Neils' easement from coverage.

Ten days later, on September 15, 2008, Miller filed a complaint for ejectment and trespass against the Neils. Miller alleged that the Neils erected improvements on

his property and refused to quit possession of the property upon request. Miller sought ejectment and removal of all improvements. The Neils answered and filed a counterclaim for quiet title. In an amended complaint, Miller alleged that the Neils were also in violation of two provisions of the Harmon Trails Estates Bill of Assurance and Protective Covenant. After answering the amended complaint, the Neils also filed a third-party complaint against the McIntosh Group. The Neils alleged that prior to their purchase of Lot 17, they were promised and later granted by the president of McIntosh Group, Mike McIntosh (who at the time owned Lots 16 and 17), an easement across Lot 16 for lateral lines for a septic system and for a shop building. Based on mutual mistake, the Neils sought reformation of the deed to Lot 17 to include not only the easement but also the additional property on Lot 16 on which their fence, kennel run, and building rested.

At trial, Miller admitted that he was aware of the Neils' easement and encroachments on Lot 16 prior to his purchase. However, he stated that regardless of that notice, the Neils only had an easement of ingress/egress on his property and that their permanent improvements should be removed. Miller also testified that the Neils were in violation of the development's Bill of Assurance, which also required the removal of the improvements.

Mr. Neil testified that in November 2006, he and his wife were interested in purchasing Lot 17 from the McIntosh Group. The lot had a home on it being constructed for McIntosh by builder Melvin Mounce. According to Mr. Neil, during construction of the home and prior to closing on Lot 17, it was discovered that there was not enough room on the lot for the lateral lines of the septic system. Mr.

Neil stated that he met with Mounce and McIntosh, and they agreed that the boundary of Lot 17 would be extended onto Lot 16. Over the objection of Miller, Mr. Neil testified that McIntosh said "I own the other lot [Lot 16] over there. Put that line where it needs to be." Mr. Neil stated that McIntosh then physically moved the boundary-line string and ribbon onto Lot 16. Mr. Neil built his fence along that line and built the shop building and kennel run in the expanded area at a cost of more than $31,000. Over the objection of Miller, Mr. Neil further testified that McIntosh said he would change the Neils' deed to reflect the boundary change. As such, Mr. Neil stated that he believed that he owned a portion of Lot 16. However, Mr. Neil conceded that his warranty deed did not reflect a change in the boundary line but rather provided him merely with an easement of ingress/egress on Lot 16. He testified that he had no other written document that demonstrated that he owned part of Lot 16.

Mounce testified he was a party to the meeting between Mr. Neil and McIntosh. When it was determined that the Neils needed additional space on their lot for the septic lines, Mounce said that McIntosh picked up the string and ribbons and moved them onto Lot 16. According to Mounce, McIntosh then said, "I own the ... lots; I will do anything I want ... I'll take care of the paperwork." However, Mounce agreed that the Neils' deed reflected that they were only given an easement on Lot 16. McIntosh was not present at trial.

At the conclusion of the trial, the court found in favor of the Neils. The trial court's findings, detailed in a subsequently filed order, were that the testimony established that the boundary line between Lot 16 and 17 was changed by agreement and the agreement was relied upon by the

Neils. Due to a mutual mistake of fact, the change in location of the boundary line was not accurately reflected in the Neils' deed to Lot 17. The trial court further found that Miller took possession of Lot 16 with notice of the Neils' equitable right to obtain reformation of their deed. Therefore, the trial court dismissed Miller's claim for ejectment and trespass and found in favor of the Neils' counterclaim for quiet title and of their third-party complaint for reformation. Miller timely appealed.

We review quiet-title, boundary-line, and reformation actions de novo. *Rio Vista, Inc. v. Miles,* 2010 Ark. App. 190, at 3, 374 S.W.3d 698, 701; *Statler v. Painter,* 84 Ark.App. 114, 119, 133 S.W.3d 425, 428 (2003). We will not, however, reverse findings of fact unless they are clearly erroneous. *Rio Vista, Inc.,* 2010 Ark. App. 190, at 3, 374 S.W.3d at 701; *Statler,* 84 Ark.App. at 119, 133 S.W.3d at 428.

A contract for the sale of land comes within the statute of frauds and must be in writing to be enforceable. *Johnston v. Curtis,* 70 Ark.App. 195, 201, 16 S.W.3d 283, 287 (2000); Ark.Code Ann. § 4–59–101(a)(4) (Repl.2001). Likewise, a material modification of a contract for the sale of land falls within the statute of frauds and must be in writing in order to be valid and binding. *Johnston,* 70 Ark. App. at 201, 16 S.W.3d at 287. A contract required to be in writing under the statute of frauds cannot be modified in essential parts by a parol agreement. *Davis v. Patel,* 32 Ark.App. 1, 4, 794 S.W.2d 158, 160 (1990). Although parol evidence is generally not admissible to vary the terms of a written instrument, it is admissible to show mutual mistake. *Garot v. Hopkins,* 266 Ark. 243, 244, 583 S.W.2d 54, 55 (1979). Additionally, an oral boundary-line agreement can be valid if four factors are present: (1) there must be uncertainty or dispute about the boundary line; (2) the

agreement must be between the adjoining landowners; (3) the line fixed must be definite and certain; and (4) there must be possession following the agreement. *Nunley v. Orsburn,* 312 Ark. 147, 150, 847 S.W.2d 702, 704 (1993).

Miller's first point on appeal is that the trial court erred in quieting title in favor of the Neils and reforming their deed to include a portion of Lot 16. He claims, and the record confirms, that he is the sole owner of Lot 16, subject to the Neils' easement. As such, Miller contends that the trial court erroneously modified the boundary line, based on the alleged oral agreement between Mr. Neil, McIntosh, and Mounce, because there was no dispute or uncertainty about the boundary between Lots 16 and 17. He further argues that the modification violated the statute of frauds. It is undisputed that the Neils have no documentation controverting Miller's sole ownership of Lot 16 or establishing that they own any portion of Lot 16. Nevertheless, the Neils dismiss the statute-of-frauds argument by arguing that parol evidence of the oral agreement was admissible to establish mutual mistake—a basis for reformation.

We hold that the trial court clearly erred in reforming the Neils' deed to include a portion of Lot 16 based on its conclusion that the boundary was changed by oral agreement and that a mutual mistake of fact occurred. First, in 2006 there was no dispute or uncertainty regarding the boundary between the lots. At that time, McIntosh owned both Lots 16 and 17, and each of the parties involved in the meeting knew the exact location of the boundary line between them.

Second, the evidence in this case simply fails to support the trial court's finding that a mistake, much less a mutual mistake, occurred. The evidence estab-

lished that McIntosh, Mounce, and Mr. Neil agreed that the Neils needed more space for lines and a shop building and that McIntosh agreed to "take care of the paperwork." The paperwork was changed and the Neils' warranty deed showed that they had an easement of ingress and egress on Lot 16. There is no recorded document conveying in fee simple any part of Lot 16 to the Neils. And while McIntosh did not testify at trial, his affidavit was attached as an exhibit to the Neils' third-party complaint and stated

> [t]o resolve the septic system issue, the Neil's (sic) were granted an easement onto a portion of Lot 16. This was to allow the Neils space that the original septic system was intended to occupy to build a shop. I expected that the shop would encroach upon Lot 16, but since the encroachment had minimal impact on the value or the sellability of Lot 16, I chose to ignore the encroachment and intended to disclose to any prospective buyer that the encroachment existed. Due to an oversight on my part, when the property was released to [Miller's predecessor], there was no mention of this encroachment.

> It has come to my attention that the deeds conveying Lots 16 and 17 do not indicate the existence of the encroachment. The appropriate deeds should be corrected.

McIntosh's affidavit does not state that he intended to convey part of Lot 16 to the Neils and mistakenly failed to do so. His affidavit stated that McIntosh intended to give the Neils an easement, and that is what he did. McIntosh's only mistake, according to his affidavit, was that he failed to tell the original purchaser (Miller's predecessor) of Lot 16 about the encroachments. Therefore, McIntosh's statement or actions do not establish that he made a mistake when he recorded the easement. Likewise, Mounce's testimony does not establish that a mistake was made. Mounce testified that McIntosh said that he would "take care of the paperwork." That could include McIntosh's grant of the easement.

We further hold that Mr. Neil's testimony that a mistake occurred fails to support the mistake finding. He testified that following the meeting with Mounce and McIntosh he thought that he owned the property on which he was encroaching. He said that he thought that his deed was going to be changed to add that property. He relied upon that belief because he built three different improvements on the property. However, the facts remain that the meeting between Mr. Neil, McIntosh, and Mounce occurred before the Neils purchased Lot 17 and that during the closing of Lot 17 the Neils were placed on notice that they were only given an easement on Lot 16. When asked during trial whether he reviewed his deed that only granted him an easement on Lot 16 at closing, Mr. Neil testified, "I'm sure that we did. We reviewed a lot of papers at closing. I don't know." Based on this evidence, we fail to see how the Neils can claim that a mistake was made.

Assuming, *arguendo*, that Mr. Neil was able to demonstrate that *he* was mistaken, such evidence certainly does not establish the requirement that the mistake was mutual. A mutual mistake is one that is reciprocal and common to both parties, each alike laboring under the same misconception in respect to the terms of the written instrument. *Statler*, 84 Ark.App. at 119, 133 S.W.3d at 428. Based on McIntosh's affidavit and his actions, along with Mounce's testimony, as discussed above, there is no evidence of mutuality in this case.

In sum, there was no dispute or uncertainty about the location of the boundary

line in 2006 when the oral agreement to provide the Neils more access to Lot 16 was made. Therefore, there was no valid oral boundary-line agreement. Further, there was a document filed of record that memorialized the oral agreement of Mr. Neil, Mounce, and McIntosh, and it only gave the Neils an easement onto Lot 16. There was no ownership conveyance of Lot 16 to the Neils. Lastly, based on the filing of the easement, the statement of McIntosh, the testimony of Mounce, and the Neils' notice of their easement at closing, there is a lack of evidence to support the finding that a mutual mistake occurred.

Interestingly, the Neils offer no response to Miller's lack-of-a-mutual-mistake argument. Instead, they focus on their efforts to obtain equitable relief. Their argument on appeal is that, relying upon the holding in *Smotherman v. Blackwell*, 222 Ark. 526, 261 S.W.2d 782 (1953), one who purchases land with notice of another's claim of equity buys subject to the equitable claim. While there are some similarities in the instant case and *Smotherman*, it is distinguishable.

In *Smotherman*, at issue was a five-and-one-half-foot strip of land between Lots 1 and 2 on a city block with eight lots total. The evidence presented at trial demonstrated that the original plat for the block, dated 1911, showed that the strip of land was part of Lot 1. Later, the block was redivided so that each lot was approximately fifty feet wide, which had the effect of transferring the strip of land in question to Lot 2. Because of an oversight (the

death of the president of the owner of the block of property), no revised plat was filed of record. Instead, the various deeds given by the development company described the lots by number only. However, at trial there was substantial evidence introduced that established that all parties involved acted under the belief that the block had been redivided.[1]

Lot 1 was owned by the Blackwells, and the adjoining Lot 2 was owned by Smotherman. In 1949 or 1950, the Blackwells had their property surveyed and discovered that their property, based on the 1911 plat, extended five and one-half feet onto Lot 2. Smotherman voiced some uncertainty about the true boundary of his property. When the parties were unable to resolve their boundary dispute, Smotherman filed suit. The trial court found in favor of the Blackwells because they were bona fide purchasers who acquired title free of Smotherman's equitable right to obtain reformation. *Smotherman*, 222 Ark. at 527, 261 S.W.2d at 783. Our supreme court reversed, holding that Smotherman's occupancy gave Blackwell notice of Smotherman's claim of ownership and that the Blackwells should have taken the precaution of having a survey made before they purchased Lot 1. Had they done that, they would have learned of Smotherman's possession and would have discovered the past events (mutual mistake) that entitled Smotherman to reformation of his deed. *Smotherman*, 222 Ark. at 528, 530, 261 S.W.2d at 783, 784.

---

1. For example, houses were built in the center of each of the lots as if the lots had been redrawn; a surveyor prepared and certified as correct an individual plat of each lot, showing each house to be centrally located on the lots as if redivided; a federal agency insured mortgages upon each house on each lot based upon the supposed revised plat; the original purchasers of the homes on the lots testified that an officer of the company showed them the property and represented the lots to be fifty-feet wide, with the houses centrally situated, and a company official corroborated this testimony; the various owners of the eight lots constructed fences, garages, and driveways based upon the supposed revised lots. *Smotherman*, 222 Ark. at 528, 261 S.W.2d at 783.

There are two significant distinguishing facts between *Smotherman* and the case at bar. One is that in *Smotherman* once the decision had been made to redivide the boundary lines of the block, no document of any kind was filed memorializing it. All that existed was the original plat and overwhelming evidence that everyone involved thought that the lot lines had been redrawn. In sharp contrast, after Mr. Neil, Mounce, and McIntosh met to discuss the Neils' septic-line issue, there was in fact a document filed memorializing the meeting—the easement.

Another distinction is the fact that there was undoubtedly a mutual mistake in *Smotherman.* The facts there were undisputed that all parties involved operated under the assumption that the lots had been redivided. As set forth above, that is not so in this case. The facts here are that McIntosh gave the Neils an easement and in his affidavit he stated that he intended to give them an easement. The only evidence of a mistake comes from Mr. Neil, who admitted that he did not have record title to any property on Lot 16, that the document given to him at closing only gave him an easement on Lot 16, and that he was "sure" that he reviewed that document at closing.

Based on these significant distinctions, we hold that *Smotherman* does not apply to the case at bar and is no basis for the relief given to the Neils by the trial court. As such, we reverse and remand with instructions that the trial court enter judgment in favor of Miller on his complaint for trespass and ejectment and dismiss the

Neils' counterclaim and third-party complaint.[2]

Reversed and remanded.

GRUBER and BROWN, JJ., agree.

**2.** Based on our disposition of Miller's first point, it is not necessary to address his second point on appeal that the trial court abused its discretion when it permitted the introduction of hearsay evidence. (Specifically, he contends that Mr. Neil's testimony about what McIntosh said in 2006 is inadmissible hearsay.) This alleged hearsay was the parol evidence the Neils introduced to establish mutual mistake. Because we hold that there was no mutual mistake, the parol evidence (and alleged hearsay evidence) is inadmissible, *Garot,* 266 Ark. at 244, 583 S.W.2d at 55, and Miller's second point is now moot.