2012 Ark. App. 456

**FAYETTEVILLE REAL ESTATE & DEVELOPMENT, LLC,** Appellant

v.

**Bradley D. NORWOOD and Christy A. Norwood, Appellees.**

**No. CA 12–44.**

Court of Appeals of Arkansas.

Sept. 5, 2012.

C. Alan Gauldin, Springdale, for appellant.

Lisle Rutledge, P.A., by Stephen A. Lisle, for appellee.

LARRY D. VAUGHT, Chief Judge.

Fayetteville Real Estate & Development, LLC, brings this appeal from a judgment of the Washington County Circuit Court dismissing its claim for trespass; reforming the deed that appellees, Bradley Norwood and Christy Norwood, were given to their property, Lot 3 in The Falls Subdivision; and granting appellees' claim for quiet title. We affirm the circuit court's decision in all respects.

This case involves Lots 2 and 3, which are contiguous. Appellant now owns Lot 2, which is vacant, and the other vacant lots in the subdivision. Like the other lots, Lots 2 and 3 have setbacks in the front, back, and sides; there is also a utility and drainage easement between them. Legacy Building & Development, LLC (LB & D), was the original developer of the subdivision. It obtained a construction loan from United Bank (UB) and gave a mortgage to secure that loan on January 18, 2006; the mortgage was filed the next day. On September 13, 2006, appellees entered into a contract for LB & D to build and then sell them a house on Lot 3 for $252,000, using a house plan selected by appellees. The covenants and restrictions in the subdivision's bill of assurance required the home to be at least 2500 square feet and to have a three-car garage.[1]

---

1. The City of Springdale accepted the subdivision's final plat and covenants on August 8, 2006.

After being paid by LB & D, UB gave LB & D a release of Lot 3 from the mortgage on October 10, 2006; a partial satisfaction of mortgage was filed on October 12, 2006. During construction of the house to be purchased by appellees, LB & D's subcontractor erroneously laid the side-loading driveway leading to the three-car garage partially across Lot 2, mostly in the utility easement. Without knowing of this error, LB & D and appellees closed on the property on February 23, 2007; the deed was filed on March 1, 2007. All of the closing documents, including the deed, only referred to Lot 3 in the property description and did not expressly convey the driveway's encroachment on Lot 2.

LB & D renewed its loan with UB on April 18, 2007, and the related "modification of mortgage" securing LB & D's remaining debt was filed on May 15, 2007. The modified mortgage excluded the lots that had already been sold, including Lot 3. Also excluded from the mortgage was Lot 1, on which LB & D had begun building a house with a garage that faced Lot 2 and which was located twelve to fourteen feet from the boundary line between the lots.

On November 2, 2007, UB filed an action against LB & D to foreclose on the mortgage secured by the unsold lots. Dean Morris, d/b/a LB & D, filed a petition for bankruptcy on November 6, 2007.[2] UB obtained an in rem foreclosure decree; for the amount of its full judgment balance ($708,335.68), it purchased the unsold lots of the subdivision, including Lot 2. The circuit court confirmed the sale on April 14, 2008. UB sold the vacant lots, including Lot 2, to appellant by general warranty deed on June 27, 2008, for $725,000. Legacy National Bank foreclosed on a mortgage it held on Lot 1, with the partial-ly-built home on it, and purchased that lot for $100,000 on July 29, 2008.

In the summer of 2008, appellees became aware that part of their driveway was on Lot 2. On November 17, 2008, appellant notified appellees that it considered their driving over Lot 2 to be a trespass and instructed them to either purchase Lot 2 (for $80,000) or cease trespassing. Appellees responded, through their attorney, that they had legal and equitable rights to use that portion of Lot 2. On July 6, 2010, appellant filed this action for trespass and ejectment. Appellees filed a counterclaim for quiet title and a third-party complaint against LB & D and Dean Morris for reformation of their deed. Appellees amended their counterclaim to include the establishment of an easement by necessity or by implication.

The case went to trial on September 1, 2011. Dean Morris, LB & D's sole owner; Brad Norwood; Gary Langham, who gave appellant an estimate for putting in a new driveway on Lot 3; John Scott, UB's president and CEO; Matt Patterson, a loan officer for UB; Greg Wise, a neighbor of appellees; and Don Pitts, UB's chairman of the board, who formed appellant (of which he is the president and owner) to buy this subdivision and other properties, testified.[3] The trial court made the following findings in its order:

1. It was the intention of Legacy Building and Development ("LBD") to convey to Bradley and Christy Norwood ("Norwoods") the land upon which their driveway is situated when it passed the deed of February 23, 2007, to the Norwoods. The Norwoods intended to receive the same land and the fact that said land was not included in the legal description in the February 23, 2007

**2.** Morris was discharged from bankruptcy on May 1, 2008.

**3.** Pitts testified that he wanted to get the property "off the bank's books."

deed was the result of a mutual mistake of fact.

2. The Norwoods proved the intention of the parties, the mutual mistake of fact, and all elements of their reformation of deed claim beyond a reasonable doubt.

3. United Bank provided a partial lien release to allow the sale of the land from LBD to the Norwoods.

4. United Bank and Fayetteville Real Estate and Development, LLC both acquired title to Lot 2 that is the subject of this case, with notice of the claim to title of the Norwoods and therefore neither took title to that lot as a bona fide purchaser.

5. United Bank's interest as a mortgagee was not prejudiced by the conveyance of the land containing the driveway from LBD to the Norwoods.

The trial court dismissed appellant's claim for trespass; reformed appellees' deed to include the driveway depicted on the attached survey, which had been filed of record; and granted appellees' claim for quiet title. The court stated that, based on these rulings, it would not reach appellees' easement claim. Appellant filed a timely notice of appeal.

Appellant raises numerous points on appeal, two of which were not preserved for review. It argues that appellees' claims are barred by res judicata because title to Lot 2 was vested in UB in the court's order confirming the foreclosure sale of the property to UB. Appellant raised this affirmative defense but did not,

however, develop or obtain a ruling on it below. We therefore need not address it. *Waggoner v. Waggoner*, 2012 Ark. App. 286, at 3, 423 S.W.3d 117, 119. Appellant also argues that the evidence was insufficient to establish an easement. Because the trial court expressly stated in its order that it would not rule on the easement claim, we will not do so. *Id.*

Most of appellant's points on appeal[4] are necessarily determined by our decision regarding the following arguments: (1) as the holder of all of the mortgagor's and mortgagee's interests as of the filing date of the mortgage, UB took priority over appellees; (2) notice of the construction on Lot 1 did not place a duty to resurvey Lot 2 on UB; (3) as the purchaser of UB's interest and priority, appellant's rights are superior to appellees'; (4) appellees failed to establish two necessary elements of reformation; (5) as a bona fide purchaser for value, appellant was not subject to appellees' claims; and (6) appellant did not assume the liabilities of LB & D.

Appellant asserts: "The Circuit Court erred in holding that LB & D 'owned' Lot 2 on the date Lot 3 was conveyed to the Norwoods. LB & D did not own legal title to Lot 2 on February 23, 2007. Legal title was held by UB, the mortgagee." Our supreme court has long held that, although a mortgagee has legal title to the mortgaged property, it actually possesses a security interest and is not an absolute owner of the property; it does not hold, at law or in equity, an absolute, unconditional, and indefeasible title. *City*

---

4. Appellant also contends: (1) by establishing superior legal title to Lot 2 and appellees' daily use of the driveway, it proved trespass and is entitled to ejectment and damages; (2) UB's interest in the property after foreclosure related back to the date of the mortgage and cut off all intervening rights; (3) the foreclosure sale extinguished appellees' legal and equitable claims to title to the strip of land in dispute on Lot 2; (4) as the foreclosure-sale purchaser, UB received all of the rights in Lot 2 held by the mortgagor and mortgagee, as of the date of recording the mortgage; (5) permitting appellees to acquire part of Lot 2 was prejudicial to appellant; and (6) appellees' claim to the strip of land on Lot 2 was, at best, an equity of redemption.

*of Fort Smith v. Carter*, 372 Ark. 93, 270 S.W.3d 822 (2008). A mortgage is simply an instrument evidencing a security for debt, and will be void upon the discharge of that debt. *Moore v. Tillman*, 170 Ark. 895, 282 S.W. 9 (1926).

 It is true, as appellant contends, that LB & D did not have the unilateral power to adversely affect UB's recorded rights:

It has long been the law in this State that nothing can be done by the mortgagor, subsequent to the execution of a valid mortgage, which can impair the rights of the mortgagee. *Deming Investment Co. v. Bank of Judsonia*, 170 Ark. 65, 68, 278 S.W. 634 (1926). The mortgagor can make no contract respecting the mortgaged property which would bind the mortgagee or prejudice his rights. *Baker–Matthews Lumber Co. v. Bank of Lepanto*, 170 Ark. 1146, 282 S.W. 995 (1926). "Under this rule, it is beyond the power of the mortgagor to disturb the priority of the mortgage after its execution. Accordingly, dealings of the mortgagor with a third person, subsequent to the execution of the mortgage, cannot affect prejudicially the rights of the mortgagee." 55 Am.Jur.2d *Mortgages* § 323 (1971). See also *Whittington v. Flint*, 43 Ark. 504 (1884). Furthermore, a mortgagee, after having his deed recorded, is not required to search the record from time to time to see whether other encumbrances have been put upon the land. *Birnie v. Main*, 29 Ark. 591 (1874).

*Amstar/First Capital, Ltd. v. McQuade*, 42 Ark.App. 185, 187, 856 S.W.2d 326, 327 (1993).

 However, this case concerns whether the trial court clearly erred in ordering the equitable remedy of reformation, and cannot be decided by simply tracing legal title to, and the priority of liens on, Lot 2. To acknowledge that appel-lant possesses all of the legal rights of UB in Lot 2 does not resolve this case; as explained below, the case law is clear that a deed to property can be reformed even when the holder of record legal title resists it. Reformation is an equitable remedy that is available when the parties have reached a complete agreement but, through mutual mistake, the terms of their agreement are not correctly reflected in the written instrument purporting to evidence the agreement. *Lambert v. Quinn*, 32 Ark.App. 184, 798 S.W.2d 448 (1990). A mutual mistake is one that is reciprocal and common to both parties, each alike laboring under the same misconception in respect to the terms of the written instrument. *Id.* at 187, 798 S.W.2d at 449. A mutual mistake must be shown by clear and decisive evidence that, at the time the agreement was reduced to writing, both parties intended their written agreement to say one thing and, by mistake, it expressed something different. *Id.* at 187, 798 S.W.2d at 449. Questions regarding the parties' intent are to be resolved by the trier of fact. *See Spann v. Lovett & Co.*, 2012 Ark. App. 107, at 13, 389 S.W.3d 77, 89; *Stalter v. Gibson*, 2010 Ark. App. 801, at 5–6, 379 S.W.3d 710, 713–14.

 Through reformation, a court may correct the legal description of the property conveyed in a deed. *Statler v. Painter*, 84 Ark.App. 114, 133 S.W.3d 425 (2003); *see, e.g., Kohn v. Pearson*, 282 Ark. 418, 670 S.W.2d 795 (1984) (reforming a deed that erroneously described a tract as lying in South 40 rather than North 40); *Colbert v. Gann*, 247 Ark. 976, 448 S.W.2d 649 (1970) (reforming a deed where the abstracter did not properly describe the land that the appellees intended to sell or that the buyer intended to buy); *Galyen v. Gillenwater*, 247 Ark. 701, 447 S.W.2d 137 (1969) (reforming a deed that inaccurately described a tract); *Guthrey v. Garis*, 245

Ark. 477, 432 S.W.2d 868 (1968) (reforming a deed to reflect NW1/4 NE1/4 rather than NE1/4 NW1/4); *Lambert*, 32 Ark.App. at 190–91, 798 S.W.2d at 451–52 (reforming a deed where a description embraced land that the seller did not intend to sell and that the buyer did not intend to buy). Further, the concept of priority does not restrict reformation to only those who were parties to the mistake. *Merryman v. Cargile*, 2012 Ark. App. 248, at 9–10, 413 S.W.3d 555, 560 (affirming a trial court's order reforming deeds to accurately reflect the acreage owned by subsequent grantees). *See also Johnston v. Sorrels*, 21 Ark.App. 87, 729 S.W.2d 21 (1987).

Whether a mutual mistake that warrants reformation occurred is a question of fact. *Stalter*, 2010 Ark. App. 801, at 5–6, 379 S.W.3d at 713–14. Even in reformation cases, where the burden of proof is by clear and convincing evidence, we defer to the superior position of the trial court to evaluate the evidence, *Akin v. First Nat'l Bank*, 25 Ark.App. 341, 758 S.W.2d 14 (1988), and the proof need not be undisputed. *Lambert*, 32 Ark.App. at 187, 798 S.W.2d at 449. Although we review traditional equity cases de novo on the record, the test on review is not whether we are convinced that there is clear and convincing evidence to support the trial court's findings but whether we can say that the trial court's findings are clearly erroneous. *Id.* at 187, 798 S.W.2d at 450.

A party cannot, however, obtain reformation if reformation would prejudice a subsequent bona fide purchaser. *Statler*, 84 Ark.App. at 120, 133 S.W.3d at 429. The reason behind such a rule is that, when a bona fide purchaser acquires an interest in land and makes an investment in the land, the party is entitled to have his expectations protected. *Id.* at 120, 133 S.W.3d at 429. The elements required to establish one's status as a bona fide purchaser, so as to defeat refor-

mation, are (1) a purchaser in good faith; (2) for valuable consideration, not by gift; (3) with no actual, constructive, or inquiry notice; (4) who would be prejudiced by reformation. 66 Am.Jur.2d *Reformation of Instruments* § 63 (2001). This analysis focuses on the "factual circumstances relating to the events surrounding a transaction, that is, the realities disclosed by the evidence as distinguished from their legal effect...." *Id.* at 281. A subsequent purchaser will be deemed to have actual notice of a prior interest in property if he is aware of such facts and circumstances as would put a person of ordinary intelligence and prudence on such inquiry that, if diligently pursued, would lead to knowledge of the prior interest. *Rice v. Welch Motor Co.*, 95 Ark.App. 100, 234 S.W.3d 327 (2006). This type of notice must be enough to excite attention or put a party on guard to call for an inquiry. *Id.* at 104–05, 234 S.W.3d at 331. Whether one buying land has actual notice of another's interest in the land is a question of fact. *Id.* at 105, 234 S.W.3d at 331.

In *Miller v. Neil*, 2010 Ark. App. 555, at 9–10, 377 S.W.3d 425, 430, we discussed *Smotherman v. Blackwell*, 222 Ark. 526, 261 S.W.2d 782 (1953), in which the supreme court had addressed a similar question:

Lot 1 was owned by the Blackwells, and the adjoining Lot 2 was owned by Smotherman. In 1949 or 1950, the Blackwells had their property surveyed and discovered that their property, based on the 1911 plat, extended five and one-half feet onto Lot 2. Smotherman voiced some uncertainty about the true boundary of his property. When the parties were unable to resolve their boundary dispute, Smotherman filed suit. The trial court found in favor of the Blackwells because they were bona fide purchasers who acquired title free of Smotherman's equitable right to ob-

tain reformation. *Smotherman,* 222 Ark. at 527, 261 S.W.2d at 783. Our supreme court reversed, holding that Smotherman's occupancy gave Blackwell notice of Smotherman's claim of ownership and that the Blackwells should have taken the precaution of having a survey made before they purchased Lot 1. Had they done that, they would have learned of Smotherman's possession and would have discovered the past events (mutual mistake) that entitled Smotherman to reformation of his deed. *Smotherman,* 222 Ark. at 528, 530, 261 S.W.2d at 783, 784.

The supreme court's discussion of notice in *Smotherman* is also relevant:

The question ... is not that of adverse possession; it is whether Smotherman's partial occupancy gives notice of his claim. In a case identical in principle, *Thalheimer v. Lockert [Lockhart],* 76 Ark. 25, 88 S.W. 591 [(1905)], we held that it does. There, as here, the description used in the deed was legally good, but it did not include all the land the parties had in mind. There, as here, the first grantee was in possession of only part of the omitted property when the common grantor sold to a third person. It was held that the second purchaser, being put on notice by possession, took subject to the plaintiff's equitable right to obtain a reformation of his deed.

... Smotherman's occupancy gave notice of the ultimate fact—that he claimed to own the land—and a landowner cannot be expected to recite offhand all the evidence that may be needed to establish his title. Had the Blackwells taken the precaution of having a survey made before they bought Lot 1 they would have learned of Smotherman's hostile

possession, and they are charged with knowledge of such facts as would have been disclosed by a diligent investigation of his claim.

222 Ark. at 529–30, 261 S.W.2d at 784.

The controlling issue in this appeal is whether the trial court clearly erred in finding that appellant was not a bona fide purchaser because it had notice of appellees' claim to the strip of land.[5] Appellant's singular focus on the date of UB's original mortgage in January 2006 is misplaced because LB & D's and the Norwoods' mutual mistake as to the description of the property to be conveyed was not the only mutual mistake that occurred. UB loaned the money to LB & D so that it could purchase the land and improve it for the development of a subdivision. That homes were to be built and the improved land was to be released from the mortgage for sale to third parties was clearly intended by UB and LB & D. When UB executed the partial release in October 2006, appellees and LB & D had a contract for construction to begin on Lot 3. UB's president testified that it filed the release so that LB & D could close the sale to appellees. Further, when LB & D conveyed Lot 3 to appellees, it still owned the adjoining Lot 2. LB & D's owner, Dean Morris, who served as the general contractor, testified that he had believed that the driveway that he had built for appellees' house was built on Lot 3; that its purpose was to provide access from the street to their house; and that he had not intended to retain legal title to the driveway. When UB executed the "modification of mortgage" in April 2007 excluding Lot 3, appellees' home was finished, the driveway was in place, and closing had occurred. UB had actual knowledge of this deed. There

---

5. We need not address the trial court's finding that there was no prejudice to UB because appellant was on inquiry notice of the prob-

lem and was not, therefore, a bona fide purchaser.

was, therefore, more than sufficient evidence to establish that LB & D, UB, and appellees believed that the deed that LB & D gave to appellees passing title to Lot 3 included all of the land improved for appellees' purchase, and that UB intended to release its security interest in *all* of the land that LB & D had improved for appellees.

There was also more than sufficient evidence that UB and appellant were on inquiry notice of the location of the driveway. The testimony of every witness who discussed the subject revealed the obvious question of whether there was sufficient space between the house on Lot 1 and appellees' driveway. Before UB purchased all of the unsold lots in the subdivision, appellees' house had already been completed; appellees had received their deed; and construction of a house on Lot 1, on the other side of Lot 2, had begun. It is also worth noting that the subdivision's restrictive covenants required appellees to build a three-car garage and park their cars off of the street, and that the driveway made it possible for appellees to comply with these provisions. UB's president and CEO and its loan officer inspected the property before the sale to appellant and, therefore, were charged with knowledge of facts that revealed boundary-line problems with Lot 2. UB's loan officer, Matt Patterson, was aware that the driveway to the house on Lot 1 could be very close to Lot 2. Don Pitts was the chairman of UB's board from the time of UB's loan to LB & D through trial; when appellant acquired Lot 2, he was the manager and owner of appellant. Patterson testified that, as a matter of standard procedure, Pitts would have been given information about the vacant lots, including Lot 2's obvious boundary problems, before appellant acquired the property from UB. In fact, Pitts inspected the property before appellant purchased it. Additionally, the trial judge personally inspected the prop-

erty and found that any reasonable person who looked at Lot 2 would have realized that it had obvious boundary-line issues. In light of these facts, we cannot say that the trial court's finding that appellant had notice of appellees' claim and was not a bona fide purchaser was clearly erroneous.

Affirmed.

ROBBINS and ABRAMSON, JJ., agree.